SECRETARY OF ADMINISTRATION AND FINANCE *vs.* ATTORNEY
GENERAL & another.[1]

Suffolk.   December 5, 1974. — March 20, 1975.

Present: TAURO, C.J., REARDON, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Attorney General.   Governor.   Constitutional Law,* Executive and
administrative departments of the Commonwealth.   *Public Office.*

In a civil action by the Secretary of Administration and Finance
against the Attorney General in which the powers of the Attorney
General's office were in question and not merely a disagreement
between the parties, it was proper for the legal counsel of the
Governor to represent the Secretary.   [157-158]
In a suit in equity for a declaratory judgment by private parties
against the Secretary of Administration and Finance in which the
defendant was represented by the Attorney General pursuant to
G. L. c. 12, § 3, he, as "chief law officer of the Commonwealth,"
had control over the conduct of the Commonwealth's case, in-
cluding the power to make a policy determination not to appeal

[1] The Trustees of the Stigmatine Fathers, Inc.

from an adverse decision, notwithstanding a request by the
Governor that he either appeal or appoint a special assistant attor-
ney general, to be paid by the Secretary, to do so.  [159, 163-165]
KAPLAN, J., dissenting.
Historical account of the office of the Attorney General of the Com-
monwealth.  [159-163]

CIVIL ACTION commenced in the Supreme Judicial
Court for the county of Suffolk on November 4, 1974.

The case was reserved and reported by *Reardon*, J.,
without decision.

*William G. Young*, Chief Legal Counsel to the
Governor (*Henry E. Clay, Alexander H. Pratt, Jr., &
Robert F. Oberkoetter* with him) for the plaintiff.

*Kenneth H. Zimble* (*Joel Z. Eigerman* with him) for
the Trustees of the Stigmatine Fathers, Inc.

*Robert H. Quinn*, Attorney General, pro se.

TAURO, C.J.  The plaintiff commenced this action
against the Attorney General before a single justice of this
court seeking a declaration that, when the Attorney
General is representing the Secretary of Administration
and Finance and Commissioner of Administration (Secre-
tary) in a civil action, he is required, at the Governor's
request, either to pursue an appeal or to appoint a special
assistant attorney general, to be paid by the Secretary, to
do so.  The Secretary, joining The Trustees of the Stig-
matine Fathers, Inc. (Trustees) as a party defendant
pursuant to G. L. c. 231A, § 8, also sought an order
extending the time for filing a notice of appeal, pursuant
to Rule 65 (a), of the Massachusetts Rules of Civil Pro-
cedure, 365 Mass. 832 (1974), and Rule 14 (b) of the
Massachusetts Rules of Appellate Procedure, 365 Mass.
859 (1974), in the related action described below.  After
a hearing, the single justice ordered that the time for
filing a notice of appeal in the related action be extended
until further order of the court, and, on request of the
parties, reported the matter to this court for determina-
tion.

The related action was brought in the Superior Court by the Trustees against the Secretary after he refused to take the steps necessary to complete the sale of property owned by the Trustees to the Board of Trustees of State Colleges (Board). In a prior Superior Court action brought by the Trustees against the Board to determine the validity of the purchase and sale agreement, a consent decree had been entered to the effect that all conditions of the agreement had been met and that the agreement was valid and binding on all parties. The Attorney General had represented the Board in that action.

In the related action against the Secretary, the Trustees argued that the prior decree estopped the Secretary from claiming that the purchase and sale agreement was invalid. The Secretary claimed that he was not bound by the prior decree because he was not a party to that action. He then argued that the purchase and sale agreement was not valid because conditions regarding appropriations had not been fulfilled. Finally, he argued that he had the power to refuse to allot the money for the purchase if, in his discretion, it was not in the best interests of the Commonwealth to do so. The case was tried on a statement of agreed facts, and the Attorney General represented the Secretary.

Although the collateral estoppel effect of a judgment against one State agency on another was a question of first impression in this Commonwealth, the Superior Court judge, in a well reasoned opinion, ruled that the Secretary was estopped from raising the invalidity of the agreement. Although we need not decide this issue, we note that, in making his decision, the judge considered the law in other jurisdictions, including a Supreme Court decision involving Federal agencies, as well as the Restatement of Judgments, general principles of res judicata and collateral estoppel, and the underlying policy arguments. After considering legislative history and constitutional questions, the judge also ruled that the Secretary

did not have discretion to refuse to allot the money that had been appropriated for the purchase. He rendered a declaratory judgment to this effect, but denied injunctive relief, relying on the assumption that a public officer will carry out his duty under the law.

Although the Attorney General represented the Secretary throughout the proceedings in the Superior Court, he decided not to appeal the judge's adverse decision.[2] Shortly thereafter, the Secretary conveyed the Governor's request to him that he obtain appellate review of the order entered in the related action on all issues except that relating to the allotment power. The Secretary orally discussed this request with the Attorney General on two subsequent occasions and repeated it later by letter.

On the last day for filing the appeal, the Governor's legal counsel telephoned the Attorney General's office and spoke to the first assistant. He repeated the Governor's request that the Attorney General either represent the Secretary on appeal or appoint, at the Secretary's expense, a special assistant for this purpose. Later that same day by written communication to the Secretary, the Attorney General declined to prosecute the appeal. The Secretary then instituted the present action.

1. Before reaching the merits, we dispose of the preliminary question whether the Secretary can properly

---

[2] In a letter sent to the Secretary, the Attorney General explained his position: "I have had the opportunity to review the material regarding *The Trustees of the Stigmatine Fathers, Inc.* vs. *David M. Marchand* (Superior Court, Equity 36050) which you forwarded to me [at] the end of last week. My study of the memorandum and pertinent citations does not change my belief that the ends of government will not be advanced by appealing the Order of . . . [the judge] in that case. The Judge's opinion is quite clear, his statements are direct and his citations are apposite notwithstanding the efforts at rebuttal in the memorandum which you forwarded. To me, this is not a question of different 'personalities' in government having a day in Court, but the application of principles of law which govern all administrators in government once the issue is decided. I regret our views cannot be compatible in this particular issue. I reiterate my position that it is this Department's intention not to appeal the decision of . . . [the judge] as he has clearly written it."

appear before us represented by counsel other than the Attorney General or his designee. Although a technical reading of G. L. c. 12, § 3, and its legislative history indicate that only the Attorney General is authorized to appear for State agencies and officers, adherence to this rule in the instant case would effectively prevent review by this court where the powers of the Attorney General are themselves in question. The Supreme Court of Pennsylvania, in a case where the Attorney General challenged the propriety of private counsel's representing a government official, said: "It would be a little short of farcical to decide that the attorney general should represent defendants on so much of their appeal as challenges the accuracy of this ruling . . . [to strike the names of private counsel from the record]. They [the officials] were entitled to have the decision of the court below on that point reviewed by us, without interference from any source, and to be represented by their own counsel in obtaining it." *Piccirilli Bros.* v. *Lewis,* 282 Pa. 328, 337 (1925). This reasoning is equally applicable in the instant case. Accordingly, we hold that the Governor's legal counsel properly represented the Secretary. We emphasize, however, that this narrow exception applies only where the powers of the Attorney General's office themselves are in question, and not in the ordinary case of disagreement between an agency and the Attorney General.[3]

2. Having disposed of the preliminary issue, we now turn to the merits of the case. The Secretary contends that the traditional attorney-client relationship exists

---

[3] We draw additional support for our decision from G. L. c. 12, § 26, which allows us to "appoint some suitable person" to perform the duties of the Attorney General in his absence. Although not itself applicable here, the statute can indicate a legislative intent not to destroy the jurisdiction of this court because of the unavailability of the Attorney General. In this case, the Attorney General, although technically present, is unavailable to represent the Secretary. Accordingly, we allow the Governor's legal counsel to proceed on his behalf.

between himself and the Attorney General, and thus it is up to him, as client, and not for the Attorney General, as attorney, to decide whether to prosecute an appeal. See Canons of Ethics and Disciplinary Rules Regulating the Practice of Law, DR 7-101 (A) (1), 359 Mass. 796, 818 (1972). See also American Bar Association Code of Professional Responsibility and Canons of Judicial Ethics (EC) 7-7 (1970). We cannot accept this contention. Although we agree that the canons permit the client to make such decisions where the traditional attorney-client relationship exists, a careful reading of G. L. c. 12, § 3, its legislative history and the history of the office of Attorney General compel us to conclude that something other than that traditional attorney-client relationship exists where the Attorney General "appears for" an officer, department head or secretary pursuant to c. 12. We hold that the Attorney General, as "chief law officer of the Commonwealth," *Commonwealth* v. *Kozlowsky*, 238 Mass. 379, 389 (1921), has control over the conduct of litigation involving the Commonwealth, and this includes the power to make a policy determination not to prosecute the Secretary's appeal in this case. We further hold that, on the record before us, no extraordinary circumstances exist which would vitiate the power in this case.[4]

The office of Attorney General has a long history, dating back as far as early Fifteenth Century in England. 6 Holdsworth, History of English Law, 460 (1924), cited in Richardson, The Office of the Attorney General: Continuity and Change, 53 Mass. L. Q. 5, 6 (1968). Although the position was still somewhat limited in scope throughout the Sixteenth Century, by early in the Seventeenth Century its development was practically complete. *Id.* at 470. "By the end of the seventeenth century the office, held by such eminent lawyers as Coke and Bacon,

---

[4] The power to make such policy determinations does not include the power to act in a capricious, arbitrary or illegal manner in refusing to represent a governmental body.

had achieved the importance and breadth of authority we associate with it today." Richardson, loc. cit. Accord, *Commonwealth* v. *Kozlowsky,* 238 Mass. at 385 (1921).

The office was first established in Massachusetts in 1680. Richardson, loc. cit. *Kozlowsky* case, *supra.* "When established it became endowed with the powers and duties appertaining to it at common law . . . .. It became one of the institutions of the common law brought by the early settlers to these shores, and its functions constituted a part of . . . our jurisprudence." *Id.* at 386. At that time, the powers and duties of the office rested largely on the common law and on needs as they arose in the practical administration of the office. There was little statutory regulation or modification of the office until adoption of the Constitution in 1780. *Ibid.*

Although the office is mentioned in many statutes in the early Nineteenth Century, it was not until 1832 that it was defined in a meaningful way. Statute 1832, c. 130, § 8, provided that the Governor should appoint a suitable person as Attorney General "with all the powers and privileges, and subject to all the duties by law belonging to said office." It further provided that the Attorney General should represent all causes in the Supreme Judicial Court in which the Commonwealth was a party or had an interest. Thus, while prescribing the area within which the Attorney General was to operate, the statute also recognized the common law powers and duties inherent in the office.

A brief experiment in 1843 did away with the office of Attorney General. See St. 1843, c. 99, § 1. It was thought that the office was superfluous and that the district attorneys could discharge all the functions of the Attorney General with little or no difficulty. This experiment was apparently unsuccessful in terms of both economy and efficiency, and in 1849 the office was

reestablished with all of its former powers. St. 1849, c. 186, §§ 2, 3, 7. See 53 Mass. L. Q. at 7 (1968).

The next major change in the office occurred in 1855 when the Seventeenth Amendment to the Massachusetts Constitution, providing for popular election of the Attorney General, was adopted. Article 17 of the Articles of Amendment apparently originated in the Constitutional Convention of 1853 and was an attempt to give the appointing power back to the "supreme power," the people. See Official Report of the Debates and Proceedings on the State Convention, 704 (1853). This amendment elevated the office of Attorney General to true constitutional stature.

It was not until 1896, however, that the office was fully developed and came to resemble its current form. It was in that year that Governor Greenhalge, in his annual address to the Legislature, called attention to what seemed to be a growing evil, that more than $50,000 was being expended by the various commissions and boards for counsel fees and legal expenses. He recommended reorganization and enlargement of "the law department of the Commonwealth," so that the Attorney General would "have compensation sufficient to command his whole time," and the department would be provided with "the assistants or deputies necessary to perform substantially all the law business of the Commonwealth." He believed that, in that way, "more unity of system and of legal . . . policy [would] be obtained than by committing this responsible labor to a dozen or a score of attorneys, acting without reference to any general plan or purpose." 1896 Senate Doc. No. 1, p. 31. In response to this address and to statements made by then Attorney General Hosea M. Knowlton in his annual report (Pub. Doc. No. 12) (1895), pp. xi-xii, the Legislature enacted St. 1896, c. 490.[5]

---

[5] Statute 1896, c. 490, reads (in part): "The attorney general shall appear for the Commonwealth, the secretary, the treasurer, and the

This statute dramatically changed the prior scheme, wherein the Attorney General appeared only in the Supreme Judicial Court and acted as advisor only, on request, in other tribunals. It required instead that the Attorney General represent the Commonwealth and department heads in *all* proceedings in which the Commonwealth was a party or interested, and in all cases where the official acts of said officers were called into question, in all courts of the Commonwealth. It further provided that such suits were to be conducted by the Attorney General or under his direction. Chapter 490 did away with the practice of having fragmented legal assistance for the Commonwealth by coordinating all legal services in the Attorney General's office. In doing so, official responsibility for the progress of suits and proceedings involving the Commonwealth was secured, *McQuesten* v. *Attorney Gen.* 187 Mass. 185, 187 (1905), and the "unity of system and of legal . . . policy" proposed by Governor Greenhalge was achieved.

Although it has undergone minor revisions, the statute governing the powers and duties of the Attorney General has remained in substance virtually unchanged since 1896. See G. L. c. 12, § 3. Thus, the Attorney General is currently mandated to "appear for the commonwealth and for state departments, officers and commissions in all suits and other civil proceedings in which the commonwealth is a party or interested, or in which the official acts and doings of said departments, officers and commissions are called in question, in all the courts of the commonwealth." G. L. c. 12, § 3, as amended through

auditor, and for all heads of departments, state boards and commissions, in all suits and other civil proceedings . . . in which the Commonwealth is a party or is interested, or in which the official acts and doings of said officers are called in question, in all the courts of the Commonwealth . . . .. All such suits and proceedings shall be conducted by him or under his direction. All legal services required by such officers and boards in matters relating to their official duties shall be performed by the attorney-general or under his direction."

St. 1943, c. 83, § 1. The crucial question in this case, then, is what role the Attorney General is to assume when he so appears.

The Attorney General represents the Commonwealth as well as the Secretary, agency or department head who requests his appearance. G. L. c. 12, § 3. He also has a common law duty to represent the public interest. *Attorney Gen.* v. *Trustees of Boston Elev. Ry.* 319 Mass. 642, 652 (1946). *Jacobson* v. *Parks & Recreation Commn. of Boston*, 345 Mass. 641, 644 (1963). Thus, when an agency head recommends a course of action, the Attorney General must consider the ramifications of that action on the interests of the Commonwealth and the public generally, as well as on the official himself and his agency. To fail to do so would be an abdication of official responsibility.

In consolidating all the legal business of the Commonwealth in one office, the Legislature empowered, and perhaps required, the Attorney General to set a unified and consistent legal policy for the Commonwealth. It would defeat this apparent purpose to allow an agency head, representing narrow interests and with a limited scope, to dictate a course of conduct to the Attorney General, and in effect to destroy any chance of uniformity and consistency. We cannot say that the language of c. 12, § 3, compels such a result. Instead, we hold that the Attorney General may refuse to prosecute an appeal where, in his judgment, an appeal would not further the interests of the Commonwealth and the public he represents.[6]

We believe our holding in this case will allow the Attorney General "to maintain the . . . [Commonwealth]

---

[6] It has long been recognized that the Attorney General possesses virtually unlimited powers in the criminal area with regard to whether to prosecute or nolle prosequi in a given case. *Commonwealth* v. *Tuck*, 20 Pick. 356, 364 (1838). *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 18 (1923). See *Opinion of the Justices*, 354 Mass. 804, 808-809 (1968).

in a consistent position in its dealings with private parties." Note, 62 Harv. L. Rev. 1050, 1057 (1949). It will allow the Attorney General to function in an efficient and comprehensive manner with regard to the Commonwealth's legal business much in the way the United States Solicitor General does regarding the legal affairs of the Federal government.[7]

We are not unmindful of the fact that our decision in this case may indicate that the Attorney General can preclude recourse to the courts by refusing to prosecute an action or an appeal, but "[w]e have neither the inclination nor the authority to override the legislative mandate that, in suits of the character of the one before us, only the attorney general, or his appointee, shall act for the State." *Piccirilli Bros.* v. *Lewis*, 282 Pa. 328, 337 (1925). We also assume that, as a public officer, the Attorney General "will carry out . . . [his] duty under the law." *Opinion of the Justices*, 354 Mass. 804, 808 (1968). True, this may result in not representing, or nominally representing, an officer in a matter in which he has already decided the question involved against the officer's views. However, this is a problem that the Legislature has power to remedy if it sees a danger of the Attorney Gen-

---

[7] The Solicitor General or the Attorney General of the United States has the power to confess error where an agency has prevailed below, see, e.g., *Mogall* v. *United States*, 333 U. S. 424 (1948); *Fogel* v. *United States*, 335 U. S. 865 (1948); *Wixman* v. *United States*, 335 U. S. 874 (1948), and to refuse to proceed with litigation or prosecute an appeal. *Confiscation Cases*, 7 Wall. 454, 457, 458 (1868). See *Federal Trade Commn.* v. *Claire Furnace Co.* 274 U. S. 160 (1927). See also Stern, "Inconsistency" in Government Litigation, 64 Harv. L. Rev. 759 (1951). Furthermore, the Solicitor General may appear to present an opposing view where an agency which is authorized to proceed with independent counsel takes a stand with which the Solicitor General disagrees. *Henderson* v. *United States*, 339 U. S. 816 (1950). Of course, there is an important distinction between the Attorney General or Solicitor General in the Federal system and the Attorney General here. In the national government, the Solicitor General and the Attorney General are appointed, and the President has the last word when there is a dispute. However, we refer to the

eral's frustrating the will of the "supreme executive magistrate." Part II, c. 2, § 1, art. 1, of the Constitution of the Commonwealth.

Although resort is ultimately to the political arena, we repeat that the Attorney General cannot act arbitrarily and capriciously or scandalously. We do not preclude recourse to the courts where such is the case.[8] Cf. *Commonwealth* v. *Descalakis, supra,* at 18-19. However, in the instant case, there is no allegation that the Attorney General's action is of this type, and there could be no finding to that effect. Accordingly, we hold that the Attorney General was acting within his power in refusing to prosecute an appeal in the related action on behalf of the Secretary.

The case is remanded to the single justice where a judgment shall be entered declaring that it is within the power of the Attorney General to refuse to prosecute the Secretary's appeal and to refuse to appoint a special assistant to do so. The order extending the time for filing a notice of appeal in the related action shall be extended for a reasonable period to allow the current Attorney General to make a determination whether an appeal would be in the best interests of the Commonwealth.

*So ordered.*

---

role of the Solicitor General in the Federal system to illustrate the effect of our decision, and not to support its rationale.

[8] We note that, where there is a policy disagreement between the Attorney General and the Governor or his designee, the appropriate procedure would be for the Attorney General to appoint a special assistant to represent the Governor's interests. It is only where the Attorney General believes that there is no merit to the appeal, or where the interests of a consistent legal policy for the Commonwealth are at stake, that the Attorney General should refuse representation at all.

KAPLAN, J. (dissenting).   What is the nature of the legal representation due to an official in the Executive Branch, responsible to the Governor, when he is involved in a civil controversy with a member of the public?   The statutory words — G. L. c. 12, § 3, up to the word "except"[1] — are by no means perfectly instructive on the matter, and I cannot extract much help from the historical account in the court's opinion.   In the end one has to interpret the statute in the light of what appears to be the sense and fitness of things in the organization of government as well as in the relations between administrator and legal advisor.

Of course, in the generality of such litigious matters the Attorney General will decide what is and what is not worth taking to court or defending there, what is or is not to be appealed, and the executive official involved will yield to the judgment of the Attorney General so that — among other practical objectives to be earnestly advanced — the State may speak to the courts in a tolerably consistent and coherent way.   It ought to be a rare case in which an official, although disagreeing with the Attorney General as to whether a case is to be brought or resisted or appealed, will refuse to accept the

---

[1] The full text of G. L. c. 12, § 3, as amended through St. 1943, c. 83, § 1, is:   "The attorney general shall appear for the commonwealth and for state departments, officers and commissions in all suits and other civil proceedings in which the commonwealth is a party or interested, or in which the official acts and doings of said departments, officers and commissions are called in question, in all the courts of the commonwealth, except upon criminal recognizances and bail bonds, and in such suits and proceedings before any other tribunal, including the prosecution of claims of the commonwealth against the United States, when requested by the governor or by the general court or either branch thereof.   All such suits and proceedings shall be prosecuted or defended by him or under his direction. Writs, summonses or other processes served upon such officers shall be forthwith transmitted by them to him.   All legal services required by such departments, officers, commissions and commissioners of pilots for district one in matters relating to their official duties shall, except as otherwise provided, be rendered by the attorney general or under his direction."

advice of the chief law officer of the Commonwealth, who should see the particular lawsuit in relation to the total pattern of the State's legal affairs. In a singular case, however, in which the official feels justified in persisting in his disagreement with the Attorney General — a case, that is to say, in which he believes that an important position is being surrendered for want of a willing advocate — it should be open to the official to go to his hierarchical superior, the Governor, and express that disagreement. At that point the chief executive, if he supports the official, ought to be able after due discussion to give directions to the chief law officer. Such directions should not be often or lightly given, but the power should be and, I think, is there. Otherwise matters of high importance to the State — or at least considered by the chief executive to be so — might be finally decided not by the responsible operator but by the lawyer.[2] In the range of cases supposed, the net result under our statute is, as I see it, roughly the same in the Commonwealth as it is in the Federal establishment; for the purpose it does not make a crucial difference that our Attorney General is an elected constitutional officer, whereas the national Attorney General holds appointive office.

It may be added that an Attorney General need not act against the clear call of his conscience. When directed in the exceptional situation to argue a cause truly repugnant to him, he steps aside and gives way to special counsel.

I would accord so much primacy to the Governor. The opinion of the court intends to give a measure of primacy to the Attorney General, but leaves unclear just what it

---

[2] Even though ultimate policy is in other hands, the Attorney General, as indicated, will as a practical matter make policy in all but the most exacerbated cases.

There are particular fields, not in question here, in which it seems he is given final authority. See, e.g., G. L. c. 12, §§ 3A-3D (certain damage claims against the Commonwealth).

is. "[W]here there is a policy disagreement between the Attorney General and the Governor or his designee," says the opinion, "the appropriate procedure would be for the Attorney General to appoint a special assistant to represent the Governor's interests." Well and good. But then the opinion adds, "It *is* only where the Attorney General believes that there is no merit to the appeal, or where the interests of a consistent legal policy for the Commonwealth are at stake, that the Attorney General should refuse representation at all." But such characterizations — "policy disagreement," "consistent legal policy" — are open to varying interpretations, and here, if I understand the court, the Attorney General is to decide. Even so, the Attorney General "cannot act arbitrarily and capriciously or scandalously," and "[w]e do not preclude recourse to the courts where such is the case." Thus there is a suggestion that the judiciary has the last word.

I acknowledge there may be wisdom sometimes in leaving the boundaries of power unclear, for if uncertainty generates confusion, it may also promote a healthy competition in the public interest. But I see no value in unclarity for the class of which the present case is an example. I would declare on the present facts that, if the Governor directs, the Attorney General is required by the statute to prosecute the Secretary's appeal or see to the appointment of other counsel to do so.

The varieties and complexities of the State organizational structures may throw up problems in the future to which the statute might speak differently than it does here. So also there may be a special role for the courts as we get into unfamiliar terrain: for example, one can imagine cases where a court might be well advised to appoint counsel to represent a view in a public matter that neither the Governor nor the Attorney General is willing to espouse. To decide the present case satisfactorily we do not require a proposition of sweeping dimensions.