952 P.2d 1215

Michael A.S. CHUN, Gladys Farm, Herbert T. Imanaka, Jimmy T. Izu, Samuel Y. Kakazu, Billy G. Southwood, Eishin Tengan and Thomas Y. Yano, Appellants–Appellees/Cross–Appellants,

v.

BOARD OF TRUSTEES OF THE EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII, Appellee–Appellant/Cross–Appellee,

and

Employees' Retirement System of the State of Hawaii, Appellee–Appellee/Cross–Appellee.

Valerie Yamada SOUTHWOOD and Barbara Jane Luke, Appellants–Appellees/Cross–Appellants,

v.

BOARD OF TRUSTEES OF THE EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII, Appellee–Appellant/Cross–Appellee,

and

Employees' Retirement System of the State of Hawaii, Appellee–Appellee/Cross–Appellee.

Nos. 19699, 19735.

Supreme Court of Hawai'i.

March 25, 1998.

Charles K.Y. Khim, on the briefs, Honolu-
lu, for appellants-appellees/cross-appellants

Michael A.S. Chun, Gladys Farm, Herbert T. Imanaka, Jimmy T. Izu, Samuel Y. Kakazu, Billy G. Southwood, Eishin Tengan, Thomas Y. Yano, Valerie Yamada Southwood, and Barbara Jane Luke.

Russell A. Suzuki, Diane Erickson, Katherine C. Desmarais, and Girard D. Lau, Deputy Attorneys General, on the briefs, for appellee-appellant/cross-appellee Board of Trustees of the Employees' Retirement System of the State of Hawai'i.

Mark J. Bennett, McCorriston Miho Miller Mukai, on the briefs, Honolulu, for appellee-appellee/cross-appellee Employees' Retirement System of the State of Hawai'i.

Before MOON, C.J., and LEVINSON, NAKAYAMA and RAMIL, JJ., and Circuit Court Judge HUDDY, in place of KLEIN, J., Recused.

LEVINSON, Justice.

The appellee-appellant/cross-appellee Board of Trustees of the Employees' Retirement System of the State of Hawai'i (the Board) and the appellee-appellee/cross-appellee Employees' Retirement System of the State of Hawai'i (the ERS) appeal, and the appellants-appellees/cross-appellants Michael A.S. Chun, Gladys Farm, Herbert T. Imanaka, Jimmy T. Izu, Samuel Y. Kakazu, Billy G. Southwood, Eishin Tengan, Thomas Y. Yano, Valerie Yamada Southwood, and Barbara Jane Luke (collectively, the Retirees)—who, as retired public school principals, vice principals, or teachers are members of the ERS—cross-appeal from the circuit court's (1) "final order," filed on March 4, 1996, reversing the Board's decision and order entered on March 23, 1995 and (2) final judgment entered on March 11, 1996.

On appeal, the Board and ERS assert that the circuit court erred in: (1) failing to defer to the Board's interpretation of the relevant statutes; (2) incorrectly construing Hawai'i Revised Statutes (HRS) §§ 79–1 (1993),[1] 88–81 (1993 & Supp. 1997),[2] and 297–38 (1993);[3]

1. HRS § 79–1 provides in relevant part:

> **Vacations of public officers and employees; exceptions.** *With the exception of school teachers, principals, and cafeteria managers employed in the public schools of the State,* ... all officers and employees of the State or of the political subdivisions of the State and all full-time elected and appointed officers and employees of the State and the political subdivisions of the State shall be entitled to and granted a vacation with pay each calendar year....
>
> An annual vacation, or any part thereof unused, shall be automatically accumulated for succeeding years, except that the total recorded accumulation shall be in no event more than ninety working days ..., but whenever the employee's accumulated vacation credit exceeds ninety working days the employee shall be paid salary in lieu of vacation to the extent of the excess if, upon investigation by the comptroller of the State ..., it is found that the excess vacation credit resulted from the employee's inability to be allowed vacation time off because of orders of the employee's appointing authority; otherwise the employee shall automatically forfeit the excess.

(Emphasis added.)

Also germane is HRS § 79–7 (1993 & Supp. 1997), which provides in relevant part:

> **Vacation allowances on termination of employment.** An employee whose employment is voluntarily terminated without prejudice during any calendar year shall be entitled to all of the employee's accumulated vacation allowance plus the employee's current accrued va-

cation allowance to and including the date of termination....

> Whenever an employee's service is to be terminated, voluntarily or involuntarily, the service, at the option of the department head or other appointing power concerned, may be terminated forthwith and *the retiring employee may be paid forthwith, in lieu of the employee's vacation allowance, the amount of compensation to which the employee would be entitled or which the employee would be allowed during the vacation period if the employee were permitted to take the employee's vacation in the normal manner* ....

(Emphasis added.)

2. HRS § 88–81 provides in relevant part:

> **Average final compensation.** Average final compensation is (1) for employees who have become members prior to January 1, 1971, the average annual compensation pay or salary upon which a member has made contributions as required by sections 88–45 and 88–46, (A) during the member's five highest paid years of credited service, [or] (B) at the option of the member, during the member's three highest paid years of credited service; *provided that no payment of salary in lieu of vacation shall be included in the computation* ....

(Emphasis added.)

An employee's average final compensation is used to calculate his or her "retirement allowance" in accordance with the formula set forth in HRS § 88–74 (1993 & Supp.1997), which provides in relevant part:

(3) ruling that, in the calculation of their pension benefits, the Retirees are entitled to the same treatment as legislators, who are deemed to be full-year employees notwithstanding that their official duties are not uniformly distributed throughout the entire calendar year; (4) setting aside the Board's factual finding, on the basis that the reasons therefore were not ascertained, that the Department of Education (DOE) treats the summer months as paid vacation time; (5) ruling that the Retirees' substantial rights were prejudiced by the inaccurate calculation of their pension benefits; and (6) including similarly situated persons, who retired subsequent to the filing of the Retirees' class action lawsuit, in the certified classes.

> **Allowance on service retirement.** Upon retirement from service, a member shall receive a retirement allowance as follows:
> (1) If the member has attained age fifty-five, a retirement allowance of two per cent of the member's average final compensation multiplied by the total number of years of the member's credited service as a class A and B member, ... plus a retirement allowance of one and one-fourth per cent of the member's average final compensation multiplied by the total number of years of prior credited service as a class C member.... If the member has not attained age fifty-five, the member's retirement allowance shall be computed as though the member had attained age fifty-five, reduced in accordance with factors of actuarial equivalence adopted by the board upon the advice of the actuary....

3. HRS § 297–38 provided:

> **Termination of employment; payment.** Any provisions to the contrary notwithstanding, whenever the service of any teacher or educational officer of the department of education is to be terminated on account of the employee's retirement, the retiring employee shall be paid, at the time of retirement, all *earned salary* in a single lump sum payment.

(Emphasis added.) This provision was repealed in 1996, when the statutes pertaining to education were recodified. *See* 1996 Haw. Sess. L. Act 89, § 19 at 178.

4. HRS § 88–24 (1993) sets forth the Board's current required composition:

> **Composition of board.** The board of trustees shall consist of eight members as follows:
> (1) The director of finance of the State, ex officio;
> (2) Four members of the system, two of whom shall be general employees, one of whom shall be a teacher, and one of whom

On cross-appeal, the Retirees contend that the circuit court erred in sustaining the Board's denial of the Retirees' motions: (1) to disqualify two trustees of the ERS—Kenneth Matsuura and Annette Hee—from participation in the Board's hearing of the Retirees' appeal on the grounds of actual bias; (2) to disqualify attorney Mark Bennett from representing the ERS at a hearing conducted before the Board on the grounds that (a) he had represented the Board itself only two months prior to the hearing and, therefore, (b) he was subject to a conflict of interest; and (3) to postpone the Board's hearing of the Retirees' appeal until (a) the recently established seat of a "retirant" member of the Board had been filled [4] and (b) the Board

> shall be a retirant to be elected by the members and retirants of the system ...; and
> (3) Three citizens of the State who are not employees, one of whom shall be a responsible officer of a bank authorized to do business within the State, or a person of similar experience, to be appointed by the governor, with the advice and consent of the senate....

This statute, as amended, became effective on July 1, 1994. *See* 1993 Haw. Sess. L. Act 349, § 5 at 824. Prior to that date, the Board's membership included two general employees and one teacher, who were elected by the membership, three citizens appointed by the governor, one of whom was required to be a financial expert, and the Director of Finance. *See* Sen. Stand. Rep. No. 947, in 1993 Senate Journal, at 1120; 1993 Haw. Sess. L. Act 349, § 1 at 823–24. In an effort "to expand membership of the Board of Trustees of the Employees' Retirement System to more accurately reflect the System's constituency," H.B. No. 1459, which eventually became Act 349, originally proposed adding two retirant members, one of whom would be elected by the members and the other appointed by the governor, thus increasing the Board's total composition to nine members. Sen. Stand. Comm. Rep. No. 947, in 1993 Senate Journal, at 1120; Hse. Stand. Comm. Rep. No. 203, in 1993 House Journal, at 1047. However, as ultimately enacted, the bill incorporated the recommendations of the Senate's Standing Committee on Education, Labor, and Employment that the appointed retirant be deleted—thereby reducing the Board's anticipated new membership to eight—and that five concurring votes be required to authorize a decision by the Board. *See* Sen. Stand. Comm. Rep. No. 947, in 1993 Senate Journal, at 1120; 1993 Sess. L. Act 349, §§ 1 and 2 at 823–24.

At the time the Board's March 1995 administrative hearing was conducted in this case, the "retirant" position, newly mandated by Act 349, had not yet been filled. Accordingly, the Retir-

appointed an "administrator," in accordance with the provisions of HRS § 88–29 (1993), as amended by Act 39 of the 1992 Hawai'i Session Laws.[5]

Because we hold—in the absence of the express authorization of the Board, conferred by an official majority vote of its members—that the ERS (at the behest of its purported "administrator") and "the Board" (at the behest of the Attorney General) lacked the power to appeal the circuit court's final order and judgment, we decline to address the merits of their points of error and dismiss their unauthorized appeals. The Retirees' cross-appeal thus being rendered moot, we need not reach the points of error raised therein.

## I. BACKGROUND

Prior to retiring, the Retirees (as public school principals, vice principals, or teachers) were all "ten-month employees" of the DOE, who worked primarily during the school year but received their salaries in equal periodic installments throughout the calendar year. The present appeal arises out of two class action lawsuits—one brought on behalf of retired principals and vice principals and the other on behalf of retired teachers—filed in the first circuit court. Each complaint sought declaratory and injunctive relief based upon the allegation that the ERS had miscalculated the benefits to which the Retirees were entitled under HRS ch. 88 by excluding the Retirees' "earned summer salaries," see supra note 3, from the computation of their "average final compensation" (AFC), as authorized by the "high-three method" described in HRS § 88–81(a)(1)(B), see supra note 2.

The circuit court entered summary judgment in favor of the retired principals and vice principals, ruled that "the lump sum payment of 'earned summer salary,' paid upon retirement[,] was compensation attributable to the month in which the member of the class retired," and therefore ordered the ERS to include those amounts in the recalculation of the principals' and vice principals' AFC. Chun v. Employees' Retirement Sys., 73 Haw. 9, 10, 828 P.2d 260, 261, reconsideration denied, 73 Haw. 625, 829 P.2d 859 (1992) (Chun I). The ERS appealed. Id. at 11, 828 P.2d at 261.

In Chun I, this court vacated the circuit court's order granting summary judgment in favor of the principals and vice principals and, pursuant to Hawaii Blind Vendors Association v. Department of Human Services,

---

ees argued that the hearing of their claims should be delayed until after the election of the "retirant" trustee, in order to provide a fair tribunal in which the competing interests represented by the various Board members were equitably balanced as envisioned by Act 349.

**5.** Act 39 of the 1992 Hawai'i Session Laws amended HRS § 88–29, which pertained to the Board's "[o]fficers, employees, [and] legal advisor," and reorganized the administrative structure of the ERS by apparently eliminating the position of "secretary" of the ERS and replacing it with an "administrator," who was to be appointed by majority vote of the Board's membership and "serve under and at the pleasure of the board." 1992 Sess. L. Act 39, §§ 1 and 2 at 52–53.

Prior to Act 39, HRS § 88–29 provided in relevant part:

**Officers, employers, legal advisor.** The board of trustees shall elect from its membership a chairman and shall by a majority vote of all its members appoint a secretary, who may, but need not, be one of its members....

Subsequent to the effective date of Act 39, HRS § 88–29 provides in relevant part:

**Officers, employees, legal advisor.** The board of trustees shall elect from its membership a chairperson, and by a majority vote of all its members, shall appoint an administrator who shall ... serve under and at the pleasure of the board....

While section 2 of Act 39 provided that "[t]he incumbent secretary of the employees' retirement system [i.e., Stanley Siu] shall serve at the pleasure of the board of trustees and may be appointed as administrator," the Board's minutes covering the period from the Act's effective date, July 1, 1992, through the Board's hearing of the Retirees' claims reveal that, although it discussed the matter, the Board had never formally appointed Siu as ERS Administrator. Indeed, on January 27, 1995, Siu testified in deposition that, as of that date, the Board had not yet appointed an Administrator and that he, Siu, was the "executive secretary" of the ERS, although the Hawai'i Department of Human Services denominated his job title as "administrator." Accordingly, the Retirees argued at the hearing that, inasmuch as (1) the proper party to defend against their claims was the Administrator and (2) the Administrator's position was still technically vacant, the hearing should be postponed until the position was filled.

71 Haw. 367, 791 P.2d 1261 (1990), remanded the case "with the direction that the [circuit] court [further] remand the matter to the ERS for a full and fair administrative hearing" prior to any further judicial action. *Chun I*, 73 Haw. at 11, 14, 828 P.2d at 261, 263. Based on *Chun I*, the circuit court likewise remanded the retired teachers' complaint to the ERS for an administrative hearing. The two matters were then consolidated for hearing by the Board.

Before the administrative hearing commenced, the Retirees moved: (1) to disqualify two trustees of the ERS—Kenneth Matsuura and Annette Hee—from participation in the hearing on the basis of alleged "actual" bias; (2) to disqualify attorney Mark Bennett from representing the ERS at the hearing by virtue of an alleged conflict of interest; and (3) to postpone the hearing of the Retirees' appeals until (a) the recently created seat for a "retirant" trustee was filled, *see supra* note 4, and (b) the Board appointed an "administrator" in accordance with the provisions of HRS § 88–29, as amended, *see supra* note 5. The Board entertained arguments regarding the foregoing motions on February 27, 1995 and, four days later, orally denied them all.

Beginning on March 1, 1995, the Board conducted an administrative "contested case" hearing of the Retirees' claims. On March 23, 1995, the Board entered the following written conclusions of law (COLs):

1. [The Retirees] have the burden of producing evidence and the burden of persuasion in this matter. The degree of proof is by a preponderance of the evidence.

2. Regulations of the Department of Education of the State of Hawaii refer to the Summer Months as summer vacation; there is no statutory definition of the term "payment of salary in lieu of vacation" as that term is used in HRS § 88–81.

3. [The ERS's] longstanding practice and its construction of HRS § 88–81 in treating the Summer Months as paid vacation and the Lump Sum Payment as payment of salary in lieu of vacation is correct.

4. [The ERS's] longstanding practice and its construction of HRS § 88–81 in that regard conforms with law, is consistent with the [ERS's] treatment of other State employees and retirees[,] and is not unfair or unjust to [the Retirees] or to other State employees or retirees.

Based upon these COLs, the Board entered a "decision" denying all of the Retirees' claims.

On April 21, 1995, pursuant to HRS § 91–14 (1993), the Retirees appealed the Board's decision to the circuit court, contending that the Board had reversibly erred in (1) interpreting the relevant statutes, (2) denying their prehearing motions, and (3) defectively conducting the hearing. After hearing oral argument, the circuit court, on March 4, 1996, entered its "final order," which reversed the Board's March 23, 1995 decision and order, ruled "[a]s a matter of law" that "the Board's interpretation and application of HRS[ ] § 88–81 [was] clearly erroneous," and reasoned as follows:

The Board's decision that teachers, vice principals[,] and principals receive paid vacation is bedded, in part, in its finding that the [DOE] has treated the summer months as paid vacation. No finding was made as to the purpose or reason why the DOE adopted this administrative treatment or the context in which this treatment is made. The context in which the DOE treats the summer months as paid vacation is significant because it directly contradicts DOE regulation 5400[,] which provides that 10 month employees are not entitled to vacation pay. As such, this court must conclude that this finding of fact is clearly erroneous.

In any event, although the DOE may have administrative reasons to "treat" the summer months as vacation and/or paid vacation, this treatment is inapplicable and irrelevant to the calculation of AFC because teachers, vice principals[,] and principals are not allowed vacation in the first instance in accordance with HRS[ ] § 79–1[,] which provides, in pertinent part, as follows:

With the *exception of school teachers, principals,* ... [and] members of the fire departments ..., all officers and employees of the State or of the political subdivisions of the State ... shall be

entitled to and granted a vacation with pay each calendar year.... (Emphasis added).

While this section does not expressly disallow teachers, principals[,] and vice principals from having vacation, the reasonable interpretation of this section in the context of the entire chapter is that a public employee is not entitled to vacation unless expressly provided for by statute. (Note that although fire fighters are also excepted under this section, HRS[ ] § 79–4 expressly provides for their vacation.) Moreover, there is no statute which enables or authorizes any agency to administratively provide for vacation which is not otherwise provided for by statute.

The Board also found that the [ERS] treat[s] the summer months as vacation for determining service credit pursuant to [HRS ch.] 88 and in calculating AFC[,] which are all factors of the retirement benefit equation. [The ERS] argue[s] that its overall determination and treatment of the factors of the retirement benefit equation are consistent with each other and result[ ] in the maximum benefit paid to [the Retirees]. [The ERS's] treatment of the summer months as vacation likewise ignores the plain and simple reading of HRS[ ] § 79–1 and the intent of [HRS ch.] 79 that teachers, principals[,] and vice principals are not statutorily entitled to vacation and that vacation cannot otherwise be given by administrative rule, regulation[,] or practice. Accordingly, the exclusion of the lump sum from calculating AFC does not result in the maximum retirement benefit[,] which [the Retirees] are entitled to receive[,] and is not in keeping with the principle set forth in *Camara v. Agsalud,* 67 Haw. 212, 685 P.2d 794 (1984).

Although the specific issue of service credit is not before this court for review, the Supreme Court in *Chun [I]* intimated that consideration must be given to all the factors of the retirement benefit equa-

tion[,] including service credit. [The ERS] argue[s] that if it did not treat the lump sum payment as "payment in lieu of vacation," it may be compelled under HRS[ ] § 88–50 to reduce the years of service credit because the summer months would then be absence without pay. [The Retirees'] counter argument is that this rationale cannot be used to justify the exclusion of the lump sum payment in this case because legislators receive a year of service credit for working only sixty (60) days in twelve calendar months. If vacation is the criteria for justifying service credit years, the absurd result would be to consider and/or deem legislators to be on vacation the balance of the calendar year. Although HRS[ ] § 88–81 sets forth the manner of calculating a legislator's AFC, it does not define nor confer legislator's service credit. Since there is no statutory provision in [HRS ch.] 88 specifically relating to the manner in which service credit is computed for teachers, vice principals and principals[,] or legislators, the calculation of their service credit years must be based upon the same statute, HRS[ ] § 88–50.[6] And while a legislator is required to be available for service at all times during his elected term, a legislator is absent from "actual" service for approximately ten (10) months out of the calendar year.

As such, [the Retirees], [who are] ten (10) month employees, in this case are entitled to the same treatment as legislators[,] who are essentially "two (2) month employees"; otherwise this would not be uniform or consistent administration as referred to in *Chun [I], supra,* 73 Haw. at 13, 828 P.2d at 262. And without commenting on the virtue and/or merits of the High 3 system, it is unimaginable that teachers, vice principals[,] and principals, like legislators, would receive fewer service credit years because of the uncontrollable nature of their respective employment schedules.

6. HRS § 88–50 (1993) provides:
   **Computation of year of service.** The board of trustees may fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service but in no case shall more than one year of service

be credited in twelve calendar months, nor shall the board allow credit as service for any period of more than one month's duration during which the employee was absent without pay.

. . . .

The Board relies on [the] DOE's and [the ERS's] longstanding practice of treating the summer months as vacation to justify its conclusion that the lump sum payment is "payment of salary in lieu of vacation[."] Moreover, the Board also relies on the absence of a statutory definition of the phrase "payment of salary in lieu of vacation" to bolster its conclusion that this is an ambiguity which entitles it to deem and treat the lump sum payment as vacation pay.

While it is true that there is no definition for the phrase "payment of salary in lieu of vacation," the lump sum *is* statutorily defined as "earned salary":

Any provisions to the contrary notwithstanding, whenever the service of any teacher or educational officer of the department of education is to be terminated on account of the employee's retirement, the retiring employee shall be paid, at the time of retirement, all *earned salary* in a single lump sum payment. (Emphasis added.) HRS[ ] § 297–38.

It is undisputed that the lump sum payment represents payroll deducted wages from [the Retirees'] paychecks during the school year. In effect, the salaries which are earned during the ten (10) month school year are pro-rated for payment over twelve (12) months. Although the deducted wages are normally payable over the summer months in June, July[,] and August, the deducted amounts are paid in a lump sum upon retirement. As such, for purposes of calculating AFC, the lump sum earned salary paid upon retirement is compensation attributable to the month in which the wage deduction was made. Since the lump sum payment is attributable to the month in which the deduction is made[,] there is no improper augmentation of the AFC base amount pursuant to [HRS] § 297–38.

Even if the DOE and [the ERS] have historically treated the summer months as vacation and even if there is no definition for the phrase "payment of salary in lieu of vacation," it is a quantum leap of logic and proper statutory construction to re-define and re-characterize "earned salary" to mean "payment of salary in lieu of vacation" simply because there is no definition of the phrase "payment of salary in lieu of vacation." By any stretch of statutory construction and interpretation, nowhere in HRS[ ] § 297–38 is "earned salary" by definition or by the actual payroll deduction remotely related to vacation within the plain meaning and common understanding of the word. Indeed, "earned salary" arises from actual labor performed, not from non-labor activities contemplated by vacation.

(Some emphasis added.) The circuit court further ruled that the Retirees' remaining points of error were without merit.

On March 11, 1996, at 8:38 a.m., the circuit court entered a final judgment, "as to all claims raised by all parties" and "resolv[ing] all claims by and against all parties," "in favor of [the Retirees] and against [the Board] and [the ERS], reversing the Board['s] final order entered on March 23, 1995."

Slightly over six hours later, at 2:50 p.m. on March 11, 1996, having received written "authorization" from Stanley Siu, *see supra* note 5, and the Department of the Attorney General, Bennett filed a notice of appeal to this court on behalf of the ERS (No. 19699).

Meanwhile, however, by March 1996, a trustee had been elected to fill the recently established "retirant" seat on the Board. Moreover, the terms of two of the Board's members who had participated in the March 1995 administrative hearing had expired, and these individuals had been replaced by new trustees who did not share their predecessors' views regarding the correctness of the Board's March 23, 1995 decision and order. Accordingly, a majority of the Board's membership no longer supported the previous position that the lump sum payment of earned salary paid to the Retirees should be classified as "salary in lieu of vacation." Therefore, during a regular meeting conducted on March 11, 1996, the Board failed to adopt a resolution authorizing an appeal of

the circuit court's March 4, 1996 "final order" and March 11, 1996 "final judgment." [7]

By letter dated March 15, 1996, the chairperson of the Board—Trustee Lee Loy—advised the Attorney General of the Board's action as follows:

> On Monday, March 11, 1996, the ERS Board of Trustees received [your] opinion regarding the appeal of the *Chun v. ERS* and *Southwood v. ERS* cases.
>
> However, for the record, a motion was made to appeal [the circuit court's] decisions pertaining to these cases. This motion failed because it did not receive the necessary majority vote.
>
> As chair of the Board, I am informing you of the Board's refusal to authorize an appeal of [the circuit court's] decisions. It is my belief that as the attorney for the Board, you must follow the decision of the Board. [HRS § 88–23 [8]] grants the Board the authority of the general administration and proper operation of the state retirement system and for making effective the provision of the law. For this reason, I do not believe that *Island[-]Gentry [Joint Venture v. State,* 57 Haw. 259, 554 P.2d 761 (1976) ] applies.
>
> While you must take such action as you deem proper, please be advised that the Board has not authorized an appeal of [the circuit court's] decision.
>
> Lastly, enclosed are the prepared comments I made to the Board during the discussion on the motion to appeal.

The enclosed "prepared comments," *inter alia,* reminded the trustees that two circuit court judges had already rejected the Board's original interpretation of "the manner in which the ERS computes AFC retirement payment for ten-month employees." Notwithstanding the chairperson's letter, on March 19, 1996, the Attorney General filed a notice of appeal to this court, purportedly on behalf of the Board, "from the Final Order Reversing the Final Decision and Order of the Board of Trustees entered on March 4, 1996 and [the] Final Judgment entered on March 11, 1996" (No. 19735). On March 25, 1996, the Retirees filed a notice of cross-appeal in No. 19735, challenging (1) the portion of the circuit court's March 4, 1996 "final order" that "held that there was no merit to the . . . points raised on appeal" by the Retirees in the circuit court "other than the point that the [Board] erred in holding that the [ERS] properly excluded from the calculation of [the Retirees'] . . . average final compensation the . . . lump sum refund of previously earned salary which was paid to [the Retirees]" and (2) the circuit court's March 11, 1996 "final judgment," to the extent that it incorporated by reference the challenged portions of the March 4, 1996 "final order." [9]

On April 4, 1996, the Retirees filed a motion to dismiss the Board's and the ERS's appeals on the related grounds that: (1) the Attorney General lacked authority to appeal on the Board's behalf because her client—the Board—had expressly refused to authorize the same; (2) inasmuch as HRS §§ 88–22 (1993),[10] 88–23 (1993),[11] and 88–110 (1993) [12]

---

**7.** HRS § 88–28 (1993) provides in relevant part:

> **Voting; rules.** Each trustee shall be entitled to one vote on the board of trustees. Five concurring votes shall be necessary for a decision by the trustees at any meeting of the board.

The record reflects that a resolution to authorize an appeal failed by a four-to-four tie vote of the Board. Specifically, the resolution to appeal the *Chun* (involving principals and vice principals) and *Southwood* (involving teachers) lawsuits was offered by motion of Trustee Jackie Ferguson–Miyamoto. The motion was seconded by Trustee Dr. Hubert Everly. Trustees Ferguson–Miyamoto and Everly—who had placed the resolution before the Board—were joined by Trustees Lee Loy and Hamamoto in voting against the resolution.

**8.** *See infra* note 11.

**9.** With the concurrence of the parties, we consolidated the foregoing appeals under No. 19699 by order dated April 24, 1996.

**10.** HRS §§ 88–22 provides:

> **System established; name.** There shall be a retirement system for the purpose of providing retirement allowances and other benefits for employees. It shall have the powers and privileges of a corporation and shall be known as the "Employees' Retirement System of the State of Hawaii" and by that name may sue or be sued, transact all of its business, invest all of its funds, and hold all of its cash and securities and other property.

*Cf.* HRS § 415–4 (1993), which enumerates the "[g]eneral powers" of corporations for profit

empowered the ERS to "sue or be sued" in its own name and vested full responsibility for the ERS's operation in the Board, the Attorney General lacked independent authority to press the appeal in the Board's name on her own initiative; and (3) the ERS's appeal was nonviable because the Board, an indispensable party, had opted to be bound by the circuit court's final judgment and had refused to join in the appeal.

In the face of the Retirees' motion, we ordered supplemental briefing on the following issues: (1) "[W]hat was the legal effect of the 4–4 vote of the Board of Trustees of the [ERS], and did the vote constitute an instruction against filing an appeal from the circuit court's judgment"; (2) "if the vote of the Board was an instruction against the filing of an appeal, does the Attorney General possess the authority to file an appeal on the Board's behalf"; and (3) "is the Administrator of the [ERS] independently authorized to file an appeal in this matter?"

## II. *DISCUSSION*

A. *By Virtue Of Its Four–To–Four Tie Vote On The Motion To Appeal The Circuit Court's Final Order And Judgment, The Board Did Not Authorize An Appeal.*

■ HRS § 88–28 (1993) provides in relevant part that "[f]ive concurring votes *shall be necessary for a decision* by the [ERS] trustees at any meeting of the board." (Emphasis added.) *See supra* note 7. Pursuant to the plain language of the statute, it therefore follows that the Board's four-to-four tie

vote regarding the motion to appeal the circuit court's final order and judgment cannot constitute a "decision by the trustees" (or, put differently, "by the Board") one way or the other, the necessary "[f]ive concurring votes" being lacking. Accordingly, the state of limbo established by the tie vote neither authorized nor affirmatively disavowed an appeal. In other words, the Board effectively took no action with respect to the "decision."

■ Under normal circumstances, an appeal brought by a party's attorney without the party's authorization constitutes grounds for dismissal, so long as the "attorney lacks standing to prosecute it in [her] own name." *Soliman v. Ebasco Servs., Inc.,* 822 F.2d 320, 323 (2d Cir.1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). However, both Siu (as the purported "administrator" of the ERS, *see supra* note 5) and the Attorney General claim authority to appeal the circuit court's final order and judgment on the ERS's behalf without the consent of the Board. For the reasons discussed below, we reject their claims.

B. *Stanley Siu, In His Capacity As A Corporate Agent Of The ERS, Lacked The Authority To Instigate The Present Appeal On The ERS's Behalf Because The Board Did Not Affirmatively Confer Such Authority.*

■ Pursuant to HRS § 88–22, *see supra* note 10, the ERS possesses the full "powers and privileges of a corporation ... and by [its] name may sue or be sued, transact all of

---

subject to the provisions of HRS ch. 415 (the "Hawai'i Business Corporations Act") and which provides in relevant part that "[e]ach corporation shall have the power ... (2) [t]o sue and be sued, complain and defend, in its corporate name[.]"

**11.** HRS § 88–23 provides:

**General administration of system vested in board.** The general administration and the responsibility for the proper operation of the retirement system and for making effective the provisions of this part and part VII of this chapter are vested in a board of trustees; subject, however, to the area of administrative control vested in the department of budget and finance by sections 26–8 and 26–35.

The relevant provisions of HRS §§ 26–8 (1993 & Supp.1997) and 26–35 (1993) are set out *infra* at notes 13 and 14.

**12.** HRS § 88–110 provides:

**Board; trustees of funds.** The board of trustees shall be trustees of the several funds of the system and may invest and reinvest such funds as authorized by this part and by law from time to time provided. Subject to the terms, conditions, limitations and restrictions of this part and by law from time to time provided, the trustees may hold, purchase, sell, assign, transfer or dispose of any of the securities and investments in which any of the funds created herein shall have been invested, as well as of the proceeds of the investments and any moneys belonging to the funds.

its business, invest all of its funds, and hold all of its cash and securities and other property." Furthermore, pursuant to HRS § 88–23, *see supra* note 11, "[t]he general administration and the responsibility for the proper operation of the [ERS] . . . are vested in [the Board]; subject . . . to the area of administrative control vested in the department of budget and finance by [HRS §§ ] 26–8 [ (1993 & Supp.1997) [13]] and 26–35 [ (1993) [14] ]." Accordingly, the powers and duties of the Board are functionally equivalent to those of the board of directors of a private corporation and are limited only by "the area[s] of administrative control" reserved to the department of budget and finance by HRS §§ 26–8 and 26–35.

■ It has long been the general rule that the authority of a board of directors to manage a corporation's affairs extends to control of the corporation's litigation—including decisions regarding its initiation, defense, abandonment, and settlement. *See United .Copper Sec. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917) ("Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders."); *Joy v. North*, 692 F.2d 880, 887 (2d Cir.1982) (applying Connecticut law) ("In the normal course of events a decision [by corporate directors] whether to bring a lawsuit is a corporate economic decision subject to the business judgment rule." (Citation omitted.)), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75

---

13. HRS § 26–8, entitled "Department of budget and finance," provides in relevant part:

(d) The employees retirement system as constituted by chapter 88 is placed within the department of budget and finance for administrative purposes. The functions, duties, and powers, subject to the administrative control of the director of finance, and the composition of the board of trustees of the employees retirement system shall be as heretofore provided by law.

14. HRS § 26–35 provides:

**Administrative supervision of boards and commissions.** Whenever any board or commission is established or placed within or transferred to a principal department for administrative purposes or subject to the administrative control or supervision of the head of the department, the following provisions shall apply except as otherwise specifically provided by this chapter:

(1) The head of the department shall represent the board or commission in communications with the governor and with the legislature.

(2) The financial requirements from state funds of the board or commission shall be submitted through the head of the department and included in the budget for the department.

(3) All rules and regulations adopted by the board or commission shall be subject to the approval of the governor.

(4) The employment, appointment, promotion, transfer, demotion, discharge, and job descriptions of all officers and employees of or under the jurisdiction of the board or commission shall be determined by the board or commission subject to the approval of the head of the department and to applicable personnel laws.

(5) All purchases of supplies, equipment, or furniture by the board or commission shall be subject to the approval of the head of the department.

(6) The head of the department shall have the power to allocate the space or spaces available to the department and which are to be occupied by the board or commission.

(7) Any quasi-judicial functions of the board or commission shall not be subject to the approval, review, or control of the head of the department.

(8) *Except as set forth hereinabove, the head of the department shall not have the power to supervise or control the board or commission in the exercise of its functions, duties, and powers.*

(Emphasis added.) The provisions of HRS § 26–35(3) would not seem to apply to the ERS or the Board by virtue of HRS § 88–23, inasmuch as they in no way relate to an "area of administrative control vested in the department of budget and finance[.]"

The role of the director of finance in the administration of the ERS is defined in greater detail in HRS ch. 88. For example, HRS § 88–24(1) provides that the director of finance shall be an ex officio member of the Board, *see supra* note 4. Thus, pursuant to HRS § 88–28, the director of finance is entitled to one vote, which may count toward the five-vote majority "necessary for a decision by the [Board]," *see supra* note 7. In addition, HRS § 88–111 (1993) provides that "[t]he State director of finance shall be the custodian of the several funds. All payment from the funds shall be made by the director of finance only upon vouchers signed by the chairperson and countersigned by such other person as may be designated by the [Board]."

L.Ed.2d 930 (1983); *Alleghany Corp. v. Kirby,* 344 F.2d 571, 573 (2d Cir.1965) ("[T]he [directors'] decision . . . not to apply for certiorari, after consultation with independent counsel and full presentation and consideration of relevant business and legal implications, did not result in 'inadequate representation as a matter of law' [sufficient to permit shareholders to intervene as of right in order to continue litigation]."); *Abramowitz v. Posner,* 513 F.Supp. 120, 127 (S.D.N.Y.1981) (applying Delaware law) ("The power of the board to manage the corporation . . . includes within its scope the power to conduct the corporation's litigation—for example, whether to institute litigation in the first instance, abandon the litigation, or settle the action." (Citations omitted.)); *Rosengarten v. International Tel. & Tel. Corp.,* 466 F.Supp. 817, 822 (S.D.N.Y.1979) (applying New York law) ("It has long been the rule that the decision whether to conduct litigation on behalf of a corporation is to be made, like other matters relating to the management of internal corporate affairs, by the corporate directors in the exercise of their business judgment." (Citations omitted.)); *James Talcott, Inc. v. McDowell,* 148 So.2d 36, 38 (Fla.Dist.Ct.App. 1962) ("A very wide discretion is necessarily reposed in the directors of a corporation. It is not the duty of the [directors] to bring suit upon every supposed wrong or injury to the corporation. . . . [A] suit might appear so desperate, or be so expensive, or, for good reasons impolitic, that [the directors] might, in the exercise of a sound discretion, deem it unwise to engage in litigation." (Citation and internal quotation marks omitted.)); *Noble v. Farmers Union Trading Co.,* 123 Mont. 518, 216 P.2d 925, 937 (1950) ("Since those who conduct the affairs of the corporation or who have the ultimate power of control over it have the right, in the first instance, to determine whether a suit shall be brought by the corporation or whether an existing controversy shall be compromised without suit, so they also have the right to inquire, consider, and determine whether a suit already brought . . . is well founded, what its chances for success may be, and whether in any event its continued maintenance may injuriously affect the present or future prosperity of the corporation." (Citation and internal quotation marks omitted.)).

Correlatively, absent express delegation of the corporate directors' authority to control the decision whether to conduct litigation on the corporation's behalf, via express provision in the corporate articles, bylaws, or a properly adopted resolution (or, as in this case, via the statutes governing the operation of the ERS), no one else may legitimately exercise that authority. *See Waikapu Sugar Co. v. Hawaiian Commercial and Sugar Co.,* 8 Haw. 343, 351 (1892) ("[T]he president of a corporation cannot by virtue of his office and without authority from the corporation begin a suit in the name of the corporation."); *see also Covington Hous. Dev. Corp. v. City of Covington,* 381 F.Supp. 427, 428–29 (E.D.Ky.1974) ("Kentucky law vests control over corporate affairs in a board of directors, except as may be otherwise provided in the articles of incorporation. The board may in turn delegate a portion of its decision making authority to responsible corporate officers. . . . While the executive director is not expressly denied the authority to institute legal proceedings, the court is cited to no article, bylaw[,] or resolution vesting such responsibility in [him]." (Citations and internal quotation marks omitted.)); *Sterling Indus., Inc. v. Ball Bearing Pen Corp.,* 298 N.Y. 483, 84 N.E.2d 790, 792–94 (1949) ("[T]he president . . . moved that the corporation bring an action against Pen [Corp.] for breach of contract and an accounting. The motion was put to a vote. Two directors voted in favor of the motion and two voted in opposition. The president then stated that in view of the tie vote, the motion had failed to be carried. He then declared the meeting at an end. No further meetings of the board were held prior to the institution of this action[,] which is one at law. . . . The question presented for our consideration, therefore, is whether a president of a corporation may institute an action . . . after he has asked his board of directors for permission so to do and it has been refused. We think he may not. . . . [T]he General Corporation Law, which provides that the business of a corporation shall be managed by its board of directors, cannot be circumvented. The [president's action] in ef-

fect amends [the statute] to read that the corporation shall be managed by its board of directors, *except in the case of a deadlock when it shall be managed by any director who happens to be president.*" (Citations omitted.) (Emphasis in original.)).

■ There are limited exceptions to the foregoing rules. First,

> [d]eadlock existing, the president has been permitted to sue or defend in behalf of the corporation where the need for action to preserve vital corporate interests [i]s urgent.
>
> ... [P]ractical necessity has dictated the rule that the president as chief officer of a going concern may[,] even in the face of deadlock[,] take steps to protect corporate interests where immediate and vital injury threatens.

*Conlee Constr. Co. v. Cay Constr. Co.*, 221 So.2d 792, 795–96 (Fla.Dist.Ct.App.1969) (citations omitted); *see also Sterling Industries*, 84 N.E.2d at 794 ("[I]t is urged that the litigation presents an emergency or a critical situation.... No evidentiary facts are alleged to indicate that a crisis is at hand or. that immediate or vital injury threatens [the] plaintiff.... [T]he complaint ... discloses no urgency on its face.... [N]o facts are alleged to indicate that its corporate existence is threatened or that its business will not continue normally." (Emphasis omitted.)).[15]

■ Second, a managing corporate officer may commence "necessary litigation" that is "incidental to the regular course of the cor-

poration's business." *Covington Hous. Dev. Corp.*, 381 F.Supp. at 430 (citations omitted). However, where litigation has arisen in the "regular course of the corporation's business," courts have preponderantly held that a managing officer's "circumscribed power [to control litigation] is negated in the event of internal corporate dissension regarding the propriety of suit." *Id.* (citations omitted); *see also Sterling Industries*, 84 N.E.2d at 792 (answering in the negative the question "whether a president of a corporation may institute an action ... after he has asked his board of directors for permission so to do and it has been refused").

■ Neither the Board nor the ERS have alleged or adduced any facts that would support a finding that the Board's failure to authorize and pursue an appeal in this case would precipitate a "crisis" in the ERS's operations or threaten an "immediate or vital injury" so as to jeopardize the ERS's very "corporate existence." Accordingly, Siu (as the purported "administrator") could not initiate an appeal on the ERS's behalf under the first exception to the general rule that only a corporation's board of directors possesses the authority to control the corporation's litigation.

The ERS, however, appears to argue, in effect, that Siu—as the ERS's purported "administrator," *see supra* note 5—was entitled to authorize the ERS's appeal because that act (1) was "surely include[d]" within "the administrator's normal duties and responsibilities" enumerated in section II.5 (entitled

---

**15.** In the context of *Sterling Industries*, we note the potential applicability of HRS § 415–96 (1993) to a "corporation for profit," which is otherwise subject to the provisions of HRS ch. 415—the "Hawai'i Business Corporation Act," *see supra* note 10. HRS § 415–96 provides in relevant part:

> **Equal division of directors; appointment of provisional director; qualifications; rights and powers; compensation.** (a) If a corporation has an even number of directors who are *equally divided and cannot agree as to the* management of its affairs, so that its business can no longer be conducted advantageously or so that there is danger that its property and business will be impaired or lost, any circuit .judge may, notwithstanding any provisions of the articles or bylaws and whether or not an action is pending for an involuntary dissolution

of the corporation, appoint a provisional director pursuant to this section. Action for such appointment may be brought by any director or by shareholders holding not less than one-third of the voting power.

> (b) A provisional director shall be an impartial person, who is neither a shareholder, nor a creditor, nor officer of the corporation, nor related by consanguinity or affinity within the third degree according to the common law to any of the other directors of the corporation or to any judge of the court by which the provisional director is appointed. A provisional director shall have all of the rights and powers of a director until the deadlock in the board ... is broken or until the provisional director is removed by order of the court or by approval of shareholders holding a majority of the voting power....

"General Responsibilities of the Various Parties") of the ERS's Board of Trustees Investment Policy and Procedures Manual (IPPM), which was formally adopted by the Board on August 28, 1995, and (2) was therefore incidental to the regular course of the ERS's business. We disagree.

Section II.5 of the IPPM identifies the ERS's "principal entities" as the Board, the "Staff," an "Actuary," "Legal Counsel," [16] "Bank Custodians," "Investment Consultants," and "Investment Managers." The Board's "Main Responsibilities," according to section II.5, include: (1) "the general administration of the [ERS]," which is "vested in the Board ... [p]ursuant to [HRS] Chapter 88"; (2) "[r]esponsib[ility] for setting policy"; and (3) maintenance of "overall responsibility for financial management of the [ERS] plan."

By contrast, section II.5 describes the function of the "Staff" as being to "carr[y] out the administration of the plan *on behalf of the Board* ... and [to be] *directly responsible to the Board* ...." (Emphases added.) The duties of the "Administrator," as the senior "Staff" person, include: (1) "responsib[ility] for the operation of the ERS ... *[u]nder the policy and executive direction of the Board*" (emphasis added); (2) "[s]et[ting] procedures to effectively carry out provision[s] of, and changes in, laws as provided by [the] Legislature"; (3) "[r]epresent[ing] the ERS as its titular head in all matters concerning the ERS as [such matters] involve[ ] State and county governments and departments and divisions thereof, the custodian, actuary, legal counsel, investment advisors, medical board, and the press"; and (4) "[r]esponsib[ility] to the Director of Finance for all phases of administration of the ERS that are subject to the administrative control or supervision of the Department of Budget and Finance in accordance with the provisions of [HRS § ] 26–35,". *see supra* note 14.

As *Waikapu Sugar Co., Covington Housing Development Corp.,* and *Sterling Industries, Inc., supra,* make clear, the Board's deadlock regarding whether to appeal the circuit court's March 4, 1996 "final order" and March 11, 1996 "final judgment" could not authorize Siu—an *agent* ostensibly serving "under and at the pleasure of the [B]oard," *see* HRS § 88–29, *supra* note 5—to transform his delegated responsibility for the supervised operations of the ERS into a mechanism for usurping the policy-making authority that HRS § 88–23, *see supra* note 11, expressly vests in the Board. Indeed, as we have noted, the IPPM (which the ERS cites as the source of Siu's authority to appeal the circuit court's final order and judgment on its behalf) expressly provides (1) that it is one of the "main responsibilities" of the Board, rather than of the "Administrator," to "set[ ] policy" for the ERS and (2) that the Administrator's "responsib[ility] for the operations of the ERS" is subordinate to "the policy and executive direction of the Board."

Thus, the ERS's observation that "[a]t no time [was Siu, in his capacity as 'Civil Service Administrator' of the ERS,] directed by the Board not to take an appeal on behalf of the ERS administration in this matter" is simply beside the point. The relevant statutes and policies of the Board (as reflected in the IPPM) governing the ERS's operation unambiguously establish that the ERS Administrator is vested with no independent policy-making authority, but, rather, is restricted to *implementing* the policy "decisions" affirmatively promulgated by no less than a five-member voting majority the Board, *see supra.* note 7. Having attended the Board's March 11, 1996 open meeting, Siu was fully aware—as the Board's minutes reflect—that the "motion ... to appeal the [circuit court's final order and judgment] failed by a vote of 4–4 opposition[.]" [17]

---

16. Regarding "Legal Counsel," section II.5 of the IPPM provides that "[t]he State Attorney General serves as the *legal advisor* to the Board[.]" (Emphasis added.)

17. Inasmuch as his signature appears immediately above his typewritten name at the end of

the minutes of the Board's March 11, 1996 regular meeting, Siu apparently drafted the minutes in conjunction with Mercedes Nakaza, the Board's "Recording Secretary." He did so in his self-described capacity as "Executive Secretary."

The ERS's argument in support of Siu's purported authority to appeal the circuit court's final order and judgment on its behalf centers primarily around its contention that "[a] determination that this delegation was illegal would run contrary to all principles of modern administrative law." We need not, however, address the legality of such an alleged delegation of authority where, as here, the record fails to show that any effective delegation occurred.

■ It is true that the ERS's Supplemental Answering Brief, relying on Siu's affidavit attached thereto, maintains that

the Board and the Attorney General decided[,] as soon as [*Chun I* ] was remanded from the Supreme Court, that because the Board was serving as adjudicator, it would not be involved in the case except in that role, would not play any part with regard to directing the litigation, and delegated all authority to the administrator.

Siu's affidavit, in turn, avers in relevant part:

After the Supreme Court remanded [*Chun I* ] for an administrative hearing before the Board ..., it became clear that there needed to be a separation of functions, as the Board would be deciding the [principals' and vice principals'] and [the teachers'] cases as adjudicators. Therefore, it was determined that the Board would not have a role in determining how the case on behalf of the ERS was presented, argued, prosecuted, etc. The Deputy Attorney General involved in the case and the Board Chairman made it clear to me that the functions to be exercised by the Board with regard to the contested case hearing were to be those of adjudicator, and that I, and my Assistant, David Shimabukuro, in conjunction with our counsel, were to make the decisions regarding how the litigation was to proceed.

Siu's affidavit, in and of itself, is insufficient to establish that the Board effectively delegated to him the authority to institute an appeal, in the ERS's name, from the circuit court's March 4, 1996 "final order" and March 11, 1996 "final judgment." Siu's affidavit attaches no minutes of a Board meeting or corporate resolution establishing that the Board delegated such authority. Obviously, neither the instructions of a deputy attorney general nor the individual comments of the Board's Chairperson constitute the five-vote majority that HRS § 88–28, *see supra* note 7, requires as a prerequisite to an effective "decision" on the part of the Board.

■ Moreover, assuming *arguendo* that there is some merit to the ERS's contention that, as a purely practical matter, the Board's adjudicative role in the March 1995 administrative "contested case" hearing necessitated the delegation of "decisions regarding how the litigation was to proceed" to the Administrator in order to preserve a "separation of functions," there is still nothing in the record reflecting any need to extend such *de facto* delegation beyond the conclusion of the administrative hearing on March 23, 1995, at which point the maintenance of a "separation of functions" ceased to be a relevant concern.[18]

We hold that Siu lacked authority, independent of the Board, to file an appeal on the ERS's behalf from the circuit court's March 4, 1996 "final order" and March 11, 1996 "final judgment."

C. *The Authority Of The Attorney General, In Her Capacity As The Statutory Attorney For The Board, Was Limited To The Exercise Of Her Professional Discretion To Organize And Develop Legal Arguments To Reflect And Vindicate The Board's Lawful Policy Decisions And Did Not Empower Her To Substitute Her Vision Of The State's Interests For That Of Her Client.*

■ The Attorney General, purporting to be the attorney for the Board in the present litigation, urges as a universal matter that "Hawai'i law confers upon the Attorney Gen-

---

**18.** In this context, and although the parties do not directly address the issue in their briefs, we note that it is unclear—given the provisions of HRS § 28–8.3 (Supp.1997), *see infra* section II.C, which took effect on July 1, 1995, *see* 1995 Haw. Sess. L. Act 178, §§ 1 and 18 at 295–96, 305—by what authority the ERS undertook to retain and compensate private counsel in connection with the present appeal.

eral the *exclusive authority to represent the state's legal interests, control the state's participation in litigation,* and protect the rights of the public at large." (Emphasis added.) By way of amplification, the Attorney General explains that

> [t]his case ... is unquestionably a matter of statewide concern. The Attorney General's authority to take legal action when she believes that important interests of the State are at stake is critical. The State and public welfare will be jeopardized if one Board's agency-specific litigation decision is permitted to override the Attorney General's decision.

Insofar as the Attorney General maintains that the foregoing understanding establishes her claimed authority to appeal the circuit court's final order and judgment in this case—in the Board's name and on behalf of the ERS—without the Board's consent, we disagree with her.[19]

The Hawai'i Constitution (1978) does not enumerate the attorney general's powers and duties; indeed, it does not mention the attorney general by title at all. The only constitutional provision that directly pertains to the attorney general appears in article V, section 6 ("Executive and Administrative Offices and Departments"), within the context of describing the terms of office of the various "single executives" who head each "principal department" of the executive branch of state government: "[T]he removal of the chief legal officer of the State shall be subject to the advice and consent of the senate." Haw. Const. art. V, § 6.

The broad parameters of the functions and powers of the department of the attorney general are set forth in HRS § 26–7 (1993), which provides in relevant part:

> **Department of the attorney general.** The department of the attorney general shall be headed by a single executive to be known as the attorney general.
>
> The department shall administer and render state legal services, including furnishing of written legal opinions to the governor, legislature, and such state departments and officers as the governor may direct; represent the State in all civil actions in which the State is a party; approve as to legality and form all documents relating to the acquisition of any land or interests in lands by the State; and, unless otherwise provided by law, prosecute cases involving violations of state laws and cases involving agreements, uniform laws, or other matters which are enforceable in the courts of the State. The attorney general

---

**19.** In support of her position, the Attorney General cites a number of decisions from other jurisdictions that accord their attorneys general absolute control over litigation undertaken on behalf of state officers and agencies. All of these decisions, however, are inapposite to the present appeal because their holdings turn on peculiarities in the controlling law of the states involved and are therefore jurisdiction-specific. A salient example is the Massachusetts case law upon which the Attorney General relies. In *Feeney v. Commonwealth*, 373 Mass. 359, 366 N.E.2d 1262 (1977), and *Secretary of Administration and Finance v. Attorney General*, 367 Mass. 154, 326 N.E.2d 334 (1975), the Massachusetts Supreme Judicial Court held that the attorney general possessed the sole discretion to choose whether to pursue an appeal. In *Secretary of Administration and Finance*, the Massachusetts high court noted that the legislature had enacted a statutory scheme that *required* the attorney general to represent the state and its department heads in *all* proceedings in order to accomplish the purpose of "consolidating all the legal business of the Commonwealth in one office," thereby "empower[ing] and perhaps requir[ing] the Attorney General to set a unified and consistent legal policy

for the Commonwealth." 326 N.E.2d at 338–39. Correlatively, the *Feeney* court took note of "the Legislature's clearly articulated determination to allocate to the Attorney General complete responsibility for all the Commonwealth's legal business," pursuant to which "the Attorney General is empowered, when he appears for State officers, to decide matters of legal policy which would normally be reserved to the client in an ordinary attorney-client relationship." 366 N.E.2d at 1266.

The Massachusetts Supreme Judicial Court acknowledged that the foregoing state of affairs "may result in not representing, or nominally representing, an officer in a matter in which [the attorney general] has already decided the question involved against the officer's views." *Secretary of Admin. and Fin.*, 326 N.E.2d at 339. However, the court deferred to legislative intent, noting that it was the responsibility of the legislature to address the "problem." *Id.* In stark contrast to Massachusetts law, HRS § 28–8.3 (Supp.1997), *see supra* note 18 and *infra* this section, by its terms, is antithetical to a legislatively expressed intent to repose the global development of a "unified and consistent legal policy" for the state in the attorney general.

shall be charged with such other duties and have such authority as heretofore provided by common law or statute.

HRS ch. 28 (1993 & Supp.1997), entitled "Attorney General," elaborates upon the duties of the attorney general and other personnel within his or her department. Salient among these duties are the following: (1) to "appear for the State personally or by deputy ... in all cases criminal or civil in which the State may be a party, or be interested," HRS § 28-1 (1993); (2) to "be vigilant and active in detecting offenders against the laws of the State, and [to] prosecute the same with diligence," HRS § 28-2 (1993); (3) to "investigate alleged violations of the law when directed to do so by the governor, or when the attorney general determines that an investigation would be in the public interest," HRS § 28-2.5(a) (1993); (4) "when requested, [to] give opinions upon questions of law submitted by the governor, the legislature, or its members, or the head of any department," HRS § 28-3 (1993); and (5) "without charge, at all times when called upon, [to] give advice and counsel to the heads of departments, district judges, and other public officers, in all matters connected with their public duties, and otherwise [to] aid and assist them," HRS § 28-4 (1993).

With respect to the "[e]mployment of attorneys" by state governmental instrumentalities, HRS § 28-8.3 (Supp.1997) provides in relevant part:

**Employment of attorneys.** (a) No department of the State other than the attorney general may employ or retain any attorney, by contract or otherwise, for the purpose of representing the State or the department in any litigation, rendering legal counsel to the department, or drafting legal documents for the department; provided that the foregoing provision shall not apply to the employment or retention of attorneys:

(1) By the public utilities commission, the labor and industrial relations appeals board, and the Hawaii labor relations board;

(2) By any court or judicial or legislative office of the State;

(3) By the legislative reference bureau;

(4) By any compilation commission that may be constituted from time to time;

(5) By the real estate commission for any action involving the real estate recovery fund;

(6) By the contractors license board for any action involving the contractors recovery fund;

(7) By the trustees for any action involving the travel agency recovery fund;

(8) By the office of Hawaiian affairs;

(9) By the department of commerce and consumer affairs for the enforcement of violations of chapters 480 and 485;

(10) As grand jury counsel;

(11) By the Hawaiian home lands trust individual claims review panel;

(12) By the Hawaii health systems corporation or any of its facilities;

(13) By the auditor;

(14) By the office of ombudsman;

(15) By the insurance division; or

(16) By a department, in the event the attorney general, for reasons deemed by the attorney general good and sufficient, declines, to employ or retain an attorney for a department; provided that the governor thereupon waives the provision of this section.

(b) For purposes of this section the term "department" includes any department, board, commission, agency, bureau, or officer of the State.

Thus, by their terms, HRS § 26-7, see *State v. Klattenhoff,* 71 Haw. 598, 602, 801 P.2d 548, 550-51 (1990), and 28-4, see *Sapienza v. Heen,* 57 Haw. 284, 286, 554 P.2d 1128, 1130 (1976), designate the attorney general as legal counsel for "public officers" and instrumentalities of the state, *inter alia,* when they are sued in their official capacities, subject to the provisions of HRS § 28-8.3(a), which enumerates with particularity those public officers and instrumentalities permitted to employ or retain legal counsel other than the attorney general.

At the same time, however, HRS § 28–1 mandates that the attorney general "represent the State in all ... civil matters where the State ... may be an interested party." *Klattenhoff*, 71 Haw. at 602, 801 P.2d at 550–51. And insofar as HRS § 26–7 confers on the attorney general "such authority as [was] heretofore provided by [the] common law," the attorney general may "appear for the [s]tate" in civil cases as "an interested party" if the attorney general regards the "public interest" as being implicated. *See, e.g., D'Amico v. Board of Med. Exam'rs*, 11 Cal.3d 1, 112 Cal.Rptr. 786, 800, 520 P.2d 10, 20 (1974) ("The Attorney General ... is the chief law officer of the state. As such[,] [s]he possesses not only extensive statutory powers but also broad powers derived from the common law relative to the protection of the public interest." (Citations omitted.)); *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del.1941) ("The authorities substantially agree that, in addition to those conferred on it by statute, the office [of Attorney General] is clothed with all of the powers and duties pertaining thereto at common law; and, as the chief law officer of the State, the Attorney General, in the absence of express legislative restriction to the contrary, may exercise all such power and authority as the public interests may from time to time require."); *State v. Heath*, 806 S.W.2d 535, 537 (Tenn.Ct.App.1990) ("The state attorney general has all common law powers of office, except insofar as they are restricted by statute.... As the chief law enforcement officer of the state, the attorney general may exercise such authority as the public interest may require.... Moreover, the attorney general may participate in litigation of a private character where it bears on the interest of the general public.").

Accordingly, there is a risk, in any given case, that the attorney general's professional obligations as legal counsel to her statutory client—a public officer or instrumentality of the state vested with policy-making authority—may clash with her vision of what is in the best global interests of the state or the public at large. As the California Supreme

Court noted in *D'Amico*, the attorney general

has the duty to defend all cases in which the state or one of its officers is a party. In the course of discharging this duty[,] [s]he is often called upon to make legal determinations both in h[er] capacity as a representative of the public interest and as statutory counsel for the state or one of its agencies or officers. In the great majority of such cases[,] no conflict will result because[,] in representing the interest of h[er] "client[,]" the Attorney General will take a position consistent with what [s]he deems to be in the public interest. In the exceptional case[,] the Attorney General, recognizing that h[er] paramount duty to represent the public interest cannot be discharged without conflict, may consent to the employment of special counsel by a state agency or officer.[20]

112 Cal.Rptr. at 800, 520 P.2d at 20 (citations omitted).

Of course, where no conflict plainly appears, and the attorney general has not asserted one, it is generally presumed "that the actions and determinations of the Attorney General in ... a lawsuit are made *both* as a representative of the public interest *and* as counsel for the state agency or officer." *Id.* (emphases in original). Indeed,

[u]nder various legal provisions, including constitutional, statutory, and common law, the responsibilities of government lawyers may include authority concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships. *See, e.g.,State v. Klattenhoff*, 71 Haw. 598, 801 P.2d 548 (1990); *Sapienza v. Heen*, 57 Haw. 284, 554 P.2d 1128 (1976); *Island–Gentry Joint Venture v. State*, 57 Haw. 259, 554 P.2d 761 (1976). For example, a lawyer for a government agency may have authority on behalf of the government to decide upon settlement or whether to appeal from an adverse judgment. *See, e.g., Island–Gentry Joint Venture v. State*, 57 Haw. [at] 264–65, 554 P.2d [at] 765 ... (recognizing Attorney General's "exclusive [statutory] authority to control and man-

---

**20.** *Cf.* HRS § 28–8.3(a)(16).

age for the State all phases of civil litigation in which the State has an interest").[21] Such authority in various respects is generally vested in the attorney general and the state's attorney in state government, ... and the same may be true of other government law officers. Also, lawyers under the supervision of these officers may be authorized to represent several government agencies in intragovernmental legal controversies in circumstances where a private lawyer could not represent multiple private clients. They also may have authority to represent the "public interest" in circumstances where a private lawyer would not be authorized to do so....

Hawai'i Rules of Professional Conduct (HRPC), *SCOPE* ¶ [4] (1995) (some brackets in original and some added).

In the present case, however, the Attorney General's tactical position, as affected by her vision of the "state's legal interests," is at variance with that of her statutory client—

the Board, as the general administrative and policy-making head of the ERS. Under the circumstances, we do not accept the Attorney General's contention that, merely because she regards her duty to represent the "state's" legal interests as being paramount to her duty to represent her statutory client's legal interests, she may, in her sole discretion, so control the course of litigation as to advance her view of the "public welfare" when it squarely conflicts with the substantive position taken by the policy-making state governmental instrumentality whom she represents as a named party to the litigation.

We believe that the present posture of the appeal before us is most aptly assessed by the following analysis of the West Virginia Supreme Court of Appeals, as set forth in *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982):

The Attorney General ordinarily exercises complete control of litigation conducted in h[er] name.[22] When the Attorney Gen-

---

**21.** We emphasize that the position we take today is not inconsistent with this court's holding in *Island–Gentry Joint Venture*, inasmuch as that decision was compelled by our observation that

the Attorney General, under the authority of HRS § 26-7 ..., has exclusive authority to control and manage for the State all phases of civil litigation in which the State has an interest, *unless authority to do so in specific matters has been expressly or impliedly granted to another department or agency.* The authority necessarily includes control of the settlement of imminent actions against the State. Under HRS § 26-7, the Attorney General has the further exclusive authority to approve as to the legality and form of all documents relating to the acquisition of any land or interest in land by the State.

We are of the opinion that implicit in the express grants of authority to the Attorney General, the Attorney General has the sole power to approve or refuse to approve as to the legality and form of any compromise settlement effectuated by the Board [of Land and Natural Resources (the BLNR)] in regards to the [BLNR's] breach of a contract to purchase land for the State.

The record is clear that no other department or agency has been expressly or impliedly granted the authority to approve or disapprove as to the legality and form of the settlement in question.

*Id.,* 57 Haw. at 264–65, 554 P.2d at 765–66 (citations and footnote omitted) (emphasis added).

By contrast, the express provisions of HRS §§ 88–22, *see supra* note 10, conferring upon the

ERS "the powers and privileges of a corporation," including the powers to "sue or be sued [and] transact all of its business," 88–23, *see supra* note 11, vesting "responsibility for the proper operation of the retirement system" in the Board, and 88–110, *see supra* note 12, empowering the Board to "dispose of any of the securities and investments in which any of the funds ... shall have been invested," divest the Attorney General of authority to take an appeal from an order pertaining to the ERS's business, the control of which the legislature has committed to the Board, subject only to "the area of administrative control vested in the department of budget and finance by sections 26–8 and 26–35," *see supra* notes 13 and 14, which are not implicated in the present appeal. Similarly, in *In re Application of Hawaiian Telephone Company*, 54 Haw. 663, 513 P.2d 1376 (1973), this court held that "the attorney general is without standing as a party to the proceedings before [the Public Utilities Commission] or as an appellant herein," based upon the express provision, contained in HRS § 26–9, that the department of regulatory agencies "shall protect the interests of consumers ... throughout the State." *Id.* at 666, 513 P.2d at 1378 (ellipsis points in original).

**22.** *See, e.g., State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 932 P.2d 316 (1997) (attorney general, as representative of the state, filed lawsuit in her own name for purpose of resolving question whether certain constitutional amendments had been lawfully enacted); *State ex rel. Bronster v. United States Steel Corp.*, 82 Hawai'i 32, 919 P.2d 294 (1996) (attorney general, as representa-

eral appears in a proceeding on behalf of the state in h[er] name, [s]he exercises h[er] discretion as to the course and conduct of the litigation. [She] assumes the role of a litigant and [s]he is entitled to represent what [s]he perceives to be the interest of the state and the public at large.

However, the Attorney General's representation of the state as an entity and the discretion that accompanies such representations are limited and finite propositions. In some cases, ... the Attorney General is statutorily charged as an administrator of the law and appears in civil proceedings on h[er] own motion as the agent and legal representative of the state and the citizens thereof.... [She] also has standing to exercise judgment in the role of a party litigant when [s]he appears ... as counsel for the state in criminal appeals and other actions to which the [s]tate ... is a party. For example, the Attorney General has the power and discretion to confess reversible error in criminal appeals before this Court.

The Attorney General performs quite a different function when [s]he appears to defend a state officer [or instrumentality] ... sued in [their] official capacity. In this circumstance the Attorney General does not appear as a party to the action. That role is filled by the state officer [or instrumentality] against whom the suit is brought. Rather, the Attorney General's function is to act as legal advisor and agent of the ... litigant and to prosecute or defend, within the bounds of the law, the decision or policy of such officer [or instrumentality] which is called into question by such lawsuit.

A problem arises, however, when, as here, the policy advocated by the state officer [or instrumentality] conflicts with what the Attorney General perceives to be the interest of the state. The [Attorney General] asserts that when such a conflict arises, the Attorney General's duty to represent the interests of the state takes preeminence over the interests the state officer [or instrumentality] seek[ ] to advocate. After all, [s]he argues, any suit brought against a state [agency] is, in effect, a suit against the state and the interest of the public must predominate.

We cannot agree with the Attorney General's characterization of h[er] powers and duties with respect to suits against state officials. Ordinarily the state acts only through its officers and agents.... [I]n the performance of their statutorily prescribed duties, some officers [or instrumentalities] ... are empowered to make good faith policy decisions which implement the laws they administer and comport with the requirements of our constitutions.... When the official policies of a particular state officer or [instrumentality] are called into question in civil litigation, that officer or [instrumentality] is entitled to the same access to the courts and zealous and adequate representation by counsel to vindicate the public interest, as is the private citizen to vindicate his [or her] personal rights.

The Legislature has designated the Attorney General as the legal representative of state officers and [instrumentalities] sued in their official capacities. In the absence of other statutory or constitutional provision to the contrary, [s]he is their sole legal representative in the courts and they are h[er] clients. When the Attorney General appears in litigation in this capacity, [s]he does so as a lawyer and an officer of the court. H[er] primary responsibility is to provide proper representation and competent counsel to the officer or [instrumentality] on whose behalf [s]he appears. The Attorney General's role in this capacity is not to make public policy in h[er] own right on behalf of the state. It is presumed, in the absence of a contrary showing, that the officer made a party to the suit has, in the performance of his [or her] official duties, acted in contemplation of the [relevant laws] and in the best interests of the state. The Attorney General's role and duty is to exercise h[er] skill as the state chief lawyer to zealously advocate

tive of the state, filed lawsuit in her own name asserting claims arising out of allegedly defective

construction of state-owned facility).

and defend the policy position of the officer or agency in the litigation.

The Legislature has thus created a traditional attorney-client relationship between the Attorney General and the state officers [or instrumentalities] [s]he is required to represent. It is well settled that in the control of litigation, the Attorney General has the duty to conform h[er] conduct to that prescribed by the rules of professional ethics. As a lawyer and an officer of the courts of this State, the Attorney General is subject to the rules of this Court governing the practice of law and the conduct of lawyers, which have the force and effect of law.

*Id.,* 296 S.E.2d at 918–20 (citations omitted).[23]

■ We are aware that this court has recognized that, "due to the [Attorney General's] statutorily mandated role[s] in our legal system, we cannot mechanically apply the [Hawai'i] Code of Professional Responsibility [ (HCPR) ] to the [Attorney General's] office." *Klattenhoff,* 71 Haw. at 603, 801 P.2d at 551. The proposition applies equally to the HRPC, which, by order of this court, replaced the HCPR effective January 1, 1994. In large part, this is because "defining precisely the identity of the client and pre-

scribing the resulting obligations of [government] lawyers may be more difficult in the government context," comment [7] to HRPC 1.13 (1995), given the fact—as noted above—that "when the client is a governmental organization, . . . in some circumstances the client may be a specific [officer,] agency, [or instrumentality,]" while in other circumstances the client is "the government as a whole." *Id.*

Accordingly, in *Klattenhoff,* we held that the attorney general

> may represent a state employee in civil matters while investigating and prosecuting him in criminal matters, so long as the staff of the [department of the attorney general] can be assigned in such a manner as to afford independent legal counsel and representation in the civil matter, and so long as such representation does not result in prejudice in the criminal matter to the person represented.

*Id.* at 605, 801 P.2d at 552. In other words, "[s]eparate units of a government agency, such as the office of attorney general, may undertake concurrent representation that would otherwise offend [the provisions of the HRPC governing conflicts of interest, including HRPC 1.7, *see infra* ], *so long as no prejudice is suffered by any of the clients.*"

---

**23.** Dissenting in *Manchin,* Justice Neely deemed the majority's position—which he characterized as ascribing to the attorney general "a role analogous to a legal aid attorney for State employees sued in their official capacity" and therefore binding the attorney general "to advocate zealously the personal opinions of the officer whom [s]he represents"—to be "untenable," inasmuch as, according to Justice Neely, the "State employee" in question, the West Virginia Secretary of State, exercised no "policy-making" authority. 296 S.E.2d at 923–24 (Neely, J., dissenting). Indeed, Justice Neely "search[ed] in vain for any provision authorizing the disbursement of state funds to vindicate the personal opinions of *ministerial employees* on . . . issues in a court of law." *Id.* at 924 (Neely, J., dissenting) (emphasis added). On the other hand, Justice Neely conceded that "[i]f in the case at bar . . ., the Secretary of State exercised any *policy-making authority,* I might be willing to confer on [the] Secretary . . . some degree of participation in what would, in [the] circumstances, be in some sense 'his' litigation." *Id.* (Neely, J., dissenting) (emphasis added). Insofar as the Board of the ERS possesses considerable "policy-making authority" and is hardly "ministerial" in its functioning, it would appear that Justice Neely would agree that the

present appeal is "in some sense [the Board's] litigation."

*Manchin* remains the law in West Virginia. *See State ex rel. Caryl v. MacQueen,* 182 W.Va. 50, 385 S.E.2d 646, 649 n. 4 (1989) (citing with approval the language of *Manchin* quoted above); *State ex rel. Fahlgren Martin, Inc. v. McGraw,* 190 W.Va. 306, 438 S.E.2d 338, 344 (1993) ("Although the facts behind this case and *Manchin* are different, the reasoning set forth in *Manchin* remains valid[.]"); *Lawyer Disciplinary Bd. v. McGraw,* 194 W.Va. 788, 461 S.E.2d 850, 862 (1995) ("In *Manchin v. Browning,* . . . this Court discussed the Attorney General's powers and duties to represent state officials in civil actions. . . . Upon determining that the role of the Attorney General 'is not to make public policy in his own right on behalf of the state[,]' but rather 'to exercise his skill as the state's chief lawyer to zealously advocate and defend the policy position of the officer or agency in the litigation[,]' this Court declared there to be a traditional attorney-client relationship between the Attorney General and the state officer he represents. . . . 296 S.E.2d at 920." (Footnote omitted.) (Brackets in original.)); *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893, 909 (1996) (Citing *Manchin* with approval).

Comment [4] to HRPC 1.10 (1995) (emphasis added).

We have never held, however, that the Attorney General is relieved of all obligations to conform her conduct to the HRPC, which are applicable to all lawyers licensed to practice in the courts of this state. HRPC Rule 1.7 (1995), for example, provides:

**Conflict of interest: General Rule.**

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Moreover, comment [4] to Rule 1.7 (1995) explains, *inter alia,* that

[l]oyalty to a client is ... impaired when a lawyer cannot consider, recommend[,] or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b) addresses such situations.... The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client....

Indeed, the legislature implicitly foresaw the likelihood of conflicts "eventuating" in connection with the Attorney General's multiple roles, duties, and functions when it enacted HRS § 28-8.3 in 1995, *see supra* note 18, conferring upon the attorney general the prerogative, "for reasons deemed ... good and sufficient," to decline "to employ or retain an attorney" to represent "any department, board, commission, agency, bureau, or officer of the State" and, in that event, authorizing the state instrumentality—with the concurrence of the governor—to retain legal counsel on its own initiative for the purpose of securing such representation. *See* HRS §§ 28-8.3(a)(16) and (b).

Accordingly, in order to insure compliance with HRPC 1.7, we expressly approve and adopt the following views, as expressed by the West Virginia Supreme Court of Appeals in *Manchin:*

The Attorney General is required to exercise h[er] independent professional judgment on behalf of a state officer [or instrumentality] for whom [s]he is bound to provide legal counsel. In this regard[,] h[er] duty is to analyze and advise h[er] clients as to the permissible alternative approaches to the conduct of the litigation. The Attorney General should inform h[er] client of the different legal strategies and defenses available and of h[er] professional opinion as to the practical effect and probability of the outcome of each alternative, so as to enable the officer [or instrumentality] to make an intelligent decision with respect to how the litigation could be conducted. *[Sh]e should then stand aside and allow h[er] client to exercise his [or her] independent judgment on which course to pursue.* We emphasize the importance of this independent judgment because "advice of counsel" is not a defense to civil or criminal liability for nonfeasance, misfeasance[,] or malfeasance in office. Once the state officer [or instrumentality] whom the Attorney General represents has determined the course he [or she] desires the litigation to take, it is the duty of the Attorney General to zealously advocate the public policy positions of h[er] client in pleadings, in negotiations, and in the courtroom and to

avoid even the appearance of impropriety by appearing to be in conflict with the desires of h[er] client.

In summary, the Attorney General's statutory authority to prosecute and defend all actions brought by or against any state officer [or instrumentality] simply provides such officer [or instrumentality] with access to [the Attorney General's] legal services and does not authorize the Attorney General "to assert his vision of state interest." *Motor Club of Iowa v. Dept. of Transportation*, 251 N.W.2d 510, 514 (Iowa 1977). The Attorney General stands in a traditional attorney-client relationship to a state officer [or instrumentality] [s]he is required by statute to defend. H[er] authority to manage and control litigation on behalf of a state officer is limited to h[er] professional discretion to organize legal arguments and to develop the case in the areas of practice and procedure so as to reflect and vindicate the lawful public policy of the officer [or instrumentality] [s]he represents. The Attorney General is not authorized in such circumstances to place h[er]self in the position of a litigant so as to represent h[er] concept of the public interest, but [s]he must defer to the decisions of the officer [or instrumentality] whom [s]he represents concerning the merits and the conduct of the litigation and advocate zealously those determinations in court.

*Manchin*, 296 S.E.2d at 920–21 (emphasis in original) (footnote omitted).

The *Manchin* rule is consistent with persuasive authority in other jurisdictions. For example, the Iowa Supreme Court, in *Motor Club of Iowa v. Department of Transportation*, 251 N.W.2d 510 (Iowa 1977), addressed a record strikingly similar to that in the present appeal. In that case, a motor club sought a declaratory judgment on a claim challenging a rule, adopted by majority vote of the commissioners of the Iowa Department of Transportation (DOT), which established a sixty-five-foot length limitation for trucks. The Iowa attorney general represented the DOT in the trial court, which found the rule invalid and entered judgment accordingly. The attorney general appealed

the trial court's judgment on the DOT's behalf. In the meantime, the composition of the DOT's commission changed, and a majority of the new commission voted to dismiss the appeal and to abide by the decision of the trial court.

Affirming the trial court, the Iowa Supreme Court reasoned in relevant part as follows:

A threshold question is whether the attorney general has authority to continue prosecution of this appeal against the wishes of the DOT. . . .

The attorney general has refused to [dismiss the appeal and abide by the decision of the trial court.] He argues that the State of Iowa is the real party in interest and contends [that] he is a constitutional officer, free to prosecute and defend any case in which the State is a party or interested. He asserts [that] he possesses complete dominion over all litigation in which he appears in the interest of the State.

It is clear [that] an attorney representing a private client under the same circumstances would be required to dismiss the appeal. The question becomes whether the attorney general's status as [a] . . . state official appearing for a department of state government renders the ordinary rule inapplicable.

. . . .

. . . An attorney general should not seek to perform his [or her] duty to represent a department of state government where the goals of the department conflict with what the attorney general believes is the state interest. State officers and state departments of government deserve adequate legal representation. No representation can be adequate unless it is without conflicts on the part of counsel.

. . . .

To accord the attorney general the power he claims would leave all branches and agencies of government deprived of access to the court except by his grace and with his consent. In a most fundamental sense such departments and agencies would thereby exist and ultimately function only through him. We believe and hold [that]

the attorney general possesses no such dominion or power.

A special problem exists where the attorney general enters litigation believing [that] his representation of the public interest is consistent with the directions and wishes of a department or agency of government. It is possible for the position of a department to change, creating a later conflict which originally seemed not to exist. Such an eventuality should not give the attorney general the power to impose his will on the department. It might well provide the basis for substitution of counsel with a tardy appearance by the attorney general in behalf of what he perceives to be the state interest.

We hold [that] the attorney general was obligated to submit to the direction of the DOT and dismiss their appeal. We declare it dismissed....

*Motor Club of Iowa*, 251 N.W.2d at 513, 515–16 (citations and footnote omitted).

*See also Santa Rita Mining Co. v. Department of Property Valuation*, 111 Ariz. 368, 530 P.2d 360, 363 (1975) ("We consider only one question: May the Attorney General of the State of Arizona appeal a decision of the Superior Court against the wishes of the state agency allegedly appealing? ... [T]he Director Property Valuation is allowed to litigate on behalf of the State of Arizona.... Having the discretion to appeal to the Superior Court, we do not think it unreasonable to hold that he has that same discretion if he is dissatisfied with an opinion of the Superior Court. It would be inconsistent to hold that the Director of Property Valuation has this discretion and then to hold that in exercising this discretion not to appeal that the Attorney General can then appeal against the director's wishes. It is the director's discretion which may be exercised and not the Attorney General's. The Attorney General is the attorney for the agency, no more. In the instant case the Attorney General did not have the power to appeal against the wishes of his client."); *State v. Hagan*, 44 N.D. 306, 175 N.W. 372, 374 (1919) ("[A]lthough it is perfectly obvious under the statute that the attorney general is the general and legal adviser of the various departments and officers of the state government, and entitled to appear and represent them in court, this does not mean that the attorney general, standing in the position of an attorney to a client, who happens to be an officer of the government, steps into the shoes of such client in wholly directing the defense and the legal steps to be taken in opposition or contrary to the wishes and demands of his [or her] client or the officer or department concerned.").

■ It is apparent from the record in the present appeal that the Attorney General did not afford the Board the loyal representation to which it was statutorily entitled. Indeed, the Attorney General acknowledges as much in "the Board's" supplemental answering brief, in which she asserts "that while the Attorney General represents state officers, *her paramount duty is to protect the interests of the people of the State.*" (Emphasis added.) Having perceived herself to be in a conflict of interest with the Board, the Attorney General was ethically obligated to recommend the retention of other counsel to represent the Board and to take such other action as, in her opinion, the circumstances required—for example, the institution of separate proceedings against the Board, collectively, or some or all of the trustees, individually, if—in her considered judgment—the Board's failure to appeal the circuit court's March 4, 1996 "final order" and March 11, 1996 "final judgment" resulted from a violation of the trustees' oath, as set forth in HRS § 88–27 (1993),[24] or from the influence of an interest prohibited by HRS § 88–33 (1993).[25]

---

24. HRS § 88–27 provides in relevant part:

  **Oath of trustees.** Each [ERS] trustee shall, within ten days after the trustee's appointment or election, take an oath of office that, so far as it devolves upon the trustee, the trustee will diligently and honestly administer the affairs of the board of trustees, and that the trustee will not knowingly violate or willingly permit to be violated any of the provisions of law applicable to the [ERS]....

25. HRS § 88–33 provides in relevant part:

  **Prohibited interest of trustees and employees of board.** Except as herein provided, no trustee ... shall have any direct interest in the gains or profits of any investment made by the

*See* HRPC 1.13(f) (1995).[26]

Based on the foregoing, we hold that the Attorney General lacked the power, without the express authorization of the Board, to file an appeal on the Board's behalf from the circuit court's March 4, 1996 "final order" and March 11, 1996 "final judgment."

## III. *CONCLUSION*

For the reasons discussed above, the ERS's and the Board's purported appeals are dismissed. The Retirees' cross-appeal thus being rendered moot, we do not reach it.

---

board, nor as such receive any pay or emolument for the trustee's ... services. No trustee ... shall, directly or indirectly, ... in any manner use the moneys of the [ERS], except to make such current and necessary payments as are authorized by the board; nor shall any trustee ... become an indorser or surety or become in any manner an obligor for moneys loaned by or borrowed from the board.

**26.** HRPC 1.13 provides in relevant part:

**ORGANIZATION AS CLIENT.**

. . . .

(f) If a government lawyer knows that an officer, employee or other person associated with the government is engaged in action, intends to act or refuses to act in a matter related to the lawyer's representation that is a violation of a legal obligation to the government or the public, or a violation of law which reasonably might be imputed to the government, the lawyer shall proceed as is reasonably necessary in the best interests of the government or the public. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, governmental policies concerning such matters, governmental chain of command, and any other relevant consideration. Any measures taken shall be designed to minimize disruption of the governmental functions. Such measures may include among others:

(1) asking for reconsideration of the matter;

(2) referring the matter to a higher authority in the government, including if warranted by the seriousness of the matter, referral to the highest government official that can act in behalf of the government on the particular matter as determined by applicable law even if the highest authority is not within the agency or department the lawyer represents; and

(3) advising that a separate legal opinion on the matter be sought and considered; and

(4) divulging of information to persons outside the government pursuant to the limitations provided in [HRPC] 1.6.